UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

EMILY MORRISON,                                    Civil Action No.: 1:21-cv-01859-SHS

               Plaintiff,          **COMPLAINT**

   -against-                             ***Jury Trial Demanded***

 SCOTIA CAPITAL (USA), INC., and
 JAKE LAWRENCE,

              Defendants.
-----------------------------------------------------X

     PLAINTIFF EMILY MORRISON, by her attorney Goddard Law PLLC, whose offices are

located at 39 Broadway, Suite 1540, New York, New York, 10006, alleges upon knowledge with

respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

     1.     This is a civil action brought on behalf of Plaintiff Emily Morrison against

Defendant Scotia Capital (USA) INC. ("Defendant Scotia") for gender discrimination, sexual

harassment, hostile work environment, and retaliation in violation of Title VII of the Civil Rights

Act of 1964 ("Title VII"), the New York State Human Rights Law, the New York City Human

Rights Law, and the Louisiana Employment Discrimination Law ("LEDL"); as well as unequal pay

in violation of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 206(d) *et seq.*, the Equal Pay

Act, and the New York Labor Law, together withany and all other causes of action which can be

reasonably inferred from the facts as set forth below.

### The Fraternity Like, Misogynistic Culture in Scotia's New York and New Orleans Offices

     2.     From the time Plaintiff started working at Scotia until her employment ended in

January 2020, she was subjected to a sexist, white male-dominated hostile work environment,

denied opportunities given to her white male counterparts, subjected to a gender-discriminatory

pay gap and retaliated against for complaining of gender discrimination and sexual harassment.

3.     The discrimination, sexual harassment and retaliation regularly occurred in New Orleans, Louisiana and in New York City. Plaintiff traveled for her job approximately 40 percent of the time.  In 2018 and 2019, until she was terminated, half of her clients and over 60% of her revenues were generated via her work in New York. Plaintiff serviced more than 50 clients in New York City, including Citadel, Luminus, Cohen and Steers, JP Morgan, George Weiss, Geosphere, UBS, Taconic, Davidson Kempner, LionPoint, Tiaa Cref, Steadfast, Holocene, Illumine, Fifth Set, Cinctive, Highline, Samlyn and Ashler Capital, among others, and interviewed potential employees in New York City. Indeed, a vast majority of Plaintiff's sales were generated via her work in New York with her New York clients.

4.     Plaintiff suffered sexual harassment, was constantly disparately treated compared to her white male counterparts, and was retaliated against in both Defendant Scotia's New York office and in Defendant Scotia's New Orleans office. Scotia's white male employees in New York constantly interfered with and blatantly attempted to steal Plaintiff's New York clients.

5.     Defendant Scotia's New York City management turned a blind eye, and/or encouraged such behavior, which they did not do with white male salespeople. Indeed, Scotia's few non-male employees were treated as second class citizens at every turn, and their accounts-especially their New York accounts were "up for grabs," as white male employees were allowed to try to poach and steal their clients. The female employees were regularly omitted from activities and events in New York that would have furthered and enhanced their development, opportunities, compensation and careers.

6.     Ultimately, when Defendant Scotia allegedly attempted to close down the New Orleans office, and even though it remains open until this day at the same location of 1100 Poydras

Street, Suite 3500, New Orleans, Louisiana, Plaintiff was denied the opportunity to work either from the New Orleans office, remotely from New Orleans or out of Defendant's New York office, though she was more qualified than the white male salespeople who were given the opportunity to work out of the New York office and had been servicing many New York employees.

7.      From 2012 to 2019, upon information and belief, out of thirty-six hires on the Energy Equity Sales & Research Team, only three were women and only in assistant researcher roles, and not a single woman was brought in or promoted to a Director Level Energy Equity Sales & Research Team at Scotia. Upon information and belief, the startling lack of female inclusion was consistent throughout Defendant Scotia, including in the corporate function, and the front offices generally,

8.      Upon information and belief, women and minorities were regularly excluded from consideration for employment on Scotia's Energy Equity Sales & Research Team.

9.      Open positions were typically automatically given to white males who embraced the fraternity like, misogynistic culture at Defendant Scotia.

10.      Upon information and belief, the fraternity like, misogynistic culture at Scotia comes from and is embraced by the overwhelmingly white male, "top" of the organization. For example, upon information and belief, Scotia President and CEO Brian Porter (hereinafter "Scotia President and CEO Porter") expressly directed that disturbing, pornographic, and sexist books containing pictures of women, including explicit references to fantasies, fetishes, and masturbation, in addition to graphic depictions of naked women in sexual bondage, sweeping the floor, and laying on each other, be openly placed in all Scotia offices. Scotia President and CEO Porter personally endorsed  the book with these images, naming them the "Scotia Photography Award Book" and expressly endorsing and celebrating the images.  *See* Exhibit 1.  Plaintiff was forced to

see the images in both the New York and New Orleans offices on multiple occasions.

11.    In other acts of blatant misogyny, the men in Defendant Scotia's New Orleans office regularly peeped at women in bathing suits at the pool across the way via binoculars that were kept at the office for the singular purpose of peeping at the women. The white male employees continually made disgusting and demeaning comments about the women's bodies even though Plaintiff regularly objected to the blatantly misogynistic behavior.

12.    In addition to seeing other women objectified, Plaintiff's superiors in both Defendant Scotia's New York and New Orleans offices regularly told Plaintiff that she was expected to "entertain" and "amuse" sexually harassing white male clients in New York and in New Orleans, Louisiana.

13.    In late 2017 or early 2018, Plaintiff's superiors, including Defendant's then New York City Managing Director, deliberately assigned her to a client in New York City who was a known sexual harasser, directing her to "entertain" him.  Plaintiff was told that the client "loved women" and would "love her." She was later told that she was assigned to the client because he "liked her" and he "wanted her," and it was clear that the only reason that she was assigned to the client was because Defendant Scotia wanted to provide him time with a woman he found attractive. The client sexually harassed her through 2018, and 2019, -including touching her sexually-at work mandated dinners in New York City and when the client attended a Defendant sponsored conference in New Orleans.  Indeed, it seemed that Defendant attempted to use Plaintiff as "bait" to get the particular client to attend the extremely expensive conference in New Orleans, which he did do. Defendant's white male employees from both New York and New Orleans watched in amusement at the 2018 and 2019 conference as the client blatantly sexually harassed Plaintiff, ignoring her objections.

14.     Scotia's lack of respect for the few female employees it did have was matched by its lack of respect for minorities. In addition to refusing to consider minority employees for professional roles, Scotia regularly condoned blatantly racist behavior. For example, three of Plaintiff's white, male co-workers came to the office dressed as Confederate Generals for Halloween. An image of these individuals in their racist costumes was widely circulated at Defendant Scotia, and thus, upon information and belief, Defendant Scotia's leadership were well aware of and in fact condoned this behavior.

15.     Plaintiff also fought blatant pay inequity during her long career at Scotia, regularly complaining and objecting in person to Defendant Scotia managers in New York and New Orleans-and being retaliated against in both places for doing so. She was severely underpaid in comparison to her white male peers despite her contributing far more to the firm's success. Plaintiff complained of the gender-based pay disparity to her superiors, but her complaints were ignored, and she was passed over for Sales Manager for a less qualified white male colleague on multiple occasions.

16.     In the last few years of Plaintiff's career, Defendant Scotia's US business line strategy and execution were largely shaped, controlled, and led by Defendant Scotia's Chief Executive Officer of Global Banking and Markets Defendant Jake Lawrence (hereinafter "Defendant CEO Lawrence"), who formerly held the roles of Co-Group Head of Global Banking and Markets and Executive Vice President and Head of Global Banking and Markets in the U.S.

17.     Defendant CEO Lawrence's business strategy for Defendant Scotia's United Stated business included keeping Defendant Scotia as white and as male as possible, while alienating, sidelining, underpaying and largely ignoring the women and people of color who had

Case 1:21-cv-01859-SHS-KHP   Document 16   Filed 09/07/21   Page 6 of 97

somehow managed to obtain jobs at Defendant Scotia, and also refusing to hire women and people of color.

18.      The Leadership team that CEO Lawrence put together consisted of white men.

19.      Upon information and belief, in or around November 2019, Defendant Scotia planned to fire Plaintiff and classify her termination as a "Reduction in Force" because of her gender, and because she had repeatedly complained about gender discrimination and asked for equal pay. Upon information and belief, Defendant Scotia planned to keep a white male Salesperson instead of Plaintiff working through and for Defendant's New York City office, even though Plaintiff was the far better performing and more qualified employee and should have been offered to work through or out of the New York office if Defendant Scotia was closing the New Orleans office.  Indeed, from 2017-2019, Defendant Scotia transferred multiple white male employees to work in the New York Office.

20.      Upon information and belief, Plaintiff was not considered to work through the New York office because she is a woman, a mother of three school age children, because she had complained about discrimination, and because Defendant Scotia had a policy that the Sales roles should consist of white male employees.

21.      Finally, after Scotia management refused to act for years, Plaintiff formally complained to Defendant Scotia's Human Resources about the discrimination, harassment, and pay disparity.

22.      Defendant Scotia's Human Resources found  that  at least nine  of Plaintiff's allegations were "substantiated," including that: Head of Research Linde used the terms "grin fuck" and "pussy" at a meeting with the Sales Team; Ben Isaacson "described his sex life to other employees" and "[Managing Director] John Doe #15 failed to address it;" Partner Doe #4 "made a

6

discriminatory comment to [Co-worker Habetz] that she should stay home with her kids;" [Co-worker] Doe #9 "called [Co-worker] Habetz a "token interviewer in 2016, and said he only interviewed a woman candidate because he had to;" "several male employees including [Manager] Doe #8 and [Partner] Doe #4 regularly used binoculars in 2018" to look out of the office windows at "various women;" "[Manager] Doe #8 called [her] an 'effing b--t-c-h' three times in the Fall of 2017, and [ManagingDirector] John Doe #15 failed to address him;" Manager Doe #8 "pressured [Plaintiff] to takeresponsibility for the [Known Sexual Harasser client] in January 2018 despite [her] expressing reservations about the client making inappropriate advances towards women, and [NYC Managing Director] John Doe #15 was present and failed to prevent it;" and "[Partner] Doe #4 repeatedly withheld and allocated fewer analysts meetings to [her] compared to [her] male colleagues.

23.    In addition, Defendant Scotia HR said they would be changing their policies with respect to the Scotia Photography Book, as well as their maternity leave policies, due to Plaintiff's complaint.

24.    Upon information and belief, following her official complaint, Defendant Scotia attempted to coverup their blatantly discriminatory behavior by firing the white male employee they had planned to retain instead of Plaintiff.

## THE PARTIES

25.    Plaintiff Emily Morrison ("Plaintiff") is a female citizen of the United States who at all times relevant to this charge resided in New Orleans, Louisiana and who regularly travelled to New York City to work in Scotia's New York office and service approximately twenty New York based clients, with whom she generated the vast majority of her sales.

26.    Plaintiff is and was, at all times relevant herein, an "individual" and "employee" of

Defendant Scotia Capital (USA), Inc. within the meaning of all relevant federal, State, and local laws including, but not limited to, Title VII of the Civil Rights Act, 42 U.S.C. §§2000e, *et seq.* Scotia Capital's New Orleans office was previously known as Howard Weil.

27.    As a woman, she is a member of a protected class within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the New York State Human Rights Law, the New York City Human Rights Law, and the Louisiana Employment Discrimination Law.

28.    Upon information and belief, at all times relevant herein, Defendant Scotia was and is a domestic corporation incorporated under the laws of the State of New York. Upon information and belief, Defendant Scotia maintains a corporate office at 250 Vesey Street, New York, New York, 10281. Upon information and belief, Plaintiff maintained significant and extensive contacts with Defendant Scotia's New York corporate office during her employment at Defendant Scotia and in fact answered to supervisors in New York, who made employment decisions concerning Plaintiff.  Plaintiff was discriminated against, treated disparately, sexually harassed and retaliated against while physically present in New York City.  She was also purposefully excluded from events, activities and clients in New York City because of her gender and not offered the opportunity to work out of New York City as were her white male comparators.

29.    Defendant Scotia was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant federal, state, and local laws.

30.    Defendant Jake Lawrence, ("Defendant CEO Lawrence") at relevant times, was the Chief Executive Officer of Defendant Scotia.

31.    Defendant CEO Lawrence, at relevant times, was Plaintiff's "employer" under Federal, State and local law and had the authority to affect the terms and conditions of Plaintiff's

employment.

32.    Defendant CEO Lawrence was primarily located in New York City during 2018 and 2019 where he dictated the terms and conditions of Plaintiff's employment and made decisions regarding where Plaintiff's employment would be located and which clients she would oversee.

**FACTUAL BACKGROUND**

**Defendant Scotia Tells Plaintiff Not to Work at Howard Weil "If She is Going to Sue for Sexual Harassment"**

33.    In or about September 2003, Plaintiff began an internship in the Research Department at Howard Weil[1] that lasted one year.

34.    In the Spring of 2004, Plaintiff expressed interest with the Sales Team in being hired as a salesperson within Howard Weil.

35.    Plaintiff went to lunch with John Doe #1, head of Defendant Scotia's Sales Department ("Head of Sales Doe #1") and asked him for a job there. He expressed reservation because of her gender, and told her that Defendant Scotia's partners and other salespersons, who were all men, told him not to hire her because her "skin wasn't thick enough," and they would "never want their wife to work there." Plaintiff told him she certainly believed she could work at Howard Weil as a woman, and that she would be very successful.

36.    Head of Sales Doe #1 told her he was interested in hiring her, but warned that he did not want to offer her a job to work at Howard Weil "if she was going to sue for sexual harassment." Plaintiff assured him that she did not want to sue anyone.

37.    After Plaintiff graduated, with a Juris Doctor and Masters of Business Administration from Tulane University Law School and Tulane Business School, Head of Sales

---

[1] In or about 2012, Scotia Capital (USA), Inc. ("Defendant Scotia") bought Howard Weil, merging the companies and bringing all Howard Weil employees under Defendant Scotia's umbrella.

Doe #1 offered her and she accepted a job at Howard Weil.

38.    On the day Plaintiff was hired, her co-worker John Doe #2 ("Co-worker Doe #2") asked her why she was on the sales floor. When she responded that Head of Sales Doe #1 had hired her, he looked at her with disgust and said, "Look around, I don't see a seat for you."

**Plaintiff Works for Commissions**

39.    Upon information and belief, at all relevant times, Howard Weil sold equity research and analysis to institutional money managers, hedge funds, mutual funds and pension funds in the energy industry. Plaintiff, as a salesperson, sold Howard Weil's research and analysis generated by Howard Weil's Research Department to the money managers, hedge funds, mutual funds, and/or pension funds. Upon information and belief, one of Howard Weil's most important assets was their annual "energy conference" in New Orleans, Louisiana (hereinafter the "Annual Energy Conference").

40.    Plaintiff was responsible for "accounts" of hedge funds, mutual funds, and insurance companies to which she would sell Howard Weil's research and analysis products. For every sale that she made, she received a percentage of the payment that the hedge fund, mutual fund, or insurance company paid Howard Weil in "commissions." All of the salespersons, including Plaintiff and the white, male salespersons, had the same job duties and tasks, which required equal skill, effort, and responsibilities.

**Howard Weil is a Sexist, White Male-Dominated, and Hostile Workplace for Plaintiff**

41.    As soon as she arrived at Howard Weil, in or about 2004, until the time she was terminated in 2020, Plaintiff was subjected to a sexist, white male-dominated, misogynistic and hostile work environment at Howard Weil. Howard Weil was an "old-boys club," and the salesmen were part of the "inner circle" of men in New Orleans society. The men at Howard Weil took vacations together, golfed together, went to "business dinners" together, went to sporting events,

fishing, hunting, social clubs, drinking events, and strip clubs together. The men never invited Plaintiff to these social events. A white male Partner of Defendant Scotia was quoted by Bloomberg explaining that "The energy business is kind of a good ol' boy business," and stating, "If you can drink a cold beer and make somebody laugh, you can probably get up the ranks quicker than other folks. I kind of fit in."

42.     The men at Howard Weil discussed business matters and business deals, and gave each other intelligence on companies, research, and industry standards and networked with other men, things that Plaintiff was not a party to because she was excluded by the men.

43.     The men at Howard Weil also openly discussed their strip club visits in great detail.

44.     Plaintiff, the white male salespersons, and the white male partners sat in an open seating arrangement where employees could hear each other's conversations even if employees were speaking in a normal speaking voice. Management's office was adjacent to the open seating arrangement and management spent about fifty-percent of his time at the trading desk on the floor where they also could hear the salespersons' conversations.

45.     All of the men consistently forwarded emails including pictures of women and pornography, so much so that Plaintiff asked them to remove her from the sales email chain because she did not want to see this derogatory and disgusting misogynistic content.

46.     On one occasion, a salesman asked her if she was wearing "panties." On another occasion she was told by a salesman that the best way to get your clients to pay you is to "make them think you want to sleep with them." Plaintiff was even further disgusted when she found out that management was aware of such comments and joked about it.

47.     The men at Howard Weil had outdated, discriminatory, and sexist ideas about women in the workplace. Because Plaintiff was the only women at Howard Weil, the men made

jokes about her working at Howard Weil, and stated (not as a joke) that Plaintiff should not be in the workplace but staying home with a family.

48.    They told the President, John Doe #5 ("President Doe #5"), that Plaintiff should not be able to work there as a woman.  Partner Doe #4 stated that she "would not do well working there as a woman" and that he did not think that she would survive.  At least two of her co-workers refused to talk to, smile at, or acknowledge Plaintiff at all. Partner Doe #4 continually attacked her to their bosses, asking to see why she was given access to meetings and continually sought to make sure she did not have access to meetings. Partner Doe #4 made it clear to the entire office that  he believed that women should not interact with men professionally, and that a female salesperson was damaging to their brand. He stated repeatedly throughout the time that they worked together that women should "stay home."[2]

49.    The white male salespersons told her to "dress up" more and "wear skirts," when she wore a dress shirt and professional slacks. They told her to "wear red lipstick" or "get a boob job" like their wives and asked about and commented on her underwear and bras, including whether she was wearing underwear. The white male salespeople treated her like she was an assistant, ordered her to make phonecalls to clients as if she was their assistant, and even told their clients that she was their assistant. They called her a "slut" and said that their male clients "only deal with her" because she "is a woman."

50.    They also regularly and routinely made racist comments.

51.    The white male salespersons were also belittling and disrespectful to the female administrative staff. They told the female administrative staff they should dress more "feminine," with high heels and skirts instead of pants, and that they should wear lipstick and "more makeup."

---

[2] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaints.

52.     White male salespersons repeatedly and constantly made jokes and comments about women's attractiveness and women's bodies. They stated that particular women were "sluts" and stated they slept around and bragged that their wives took care of "everything" they needed and got "boob jobs," and celebrated men who had extra-marital affairs. The white male salespersons brought women's and naked women's pictures up on their computer and judged their attractiveness.

53.     White male salespersons referred to female (and minority) politicians in a derogatory and discriminatory manner, using gender and race-based stereotypes to describe them.

**Plaintiff is Not Given a Book of Business Like the Men, and Told to Start Cold Calling**

54.     When Plaintiff started at Defendant Scotia, she was informed that she would not be given a "book of business," like the rest of the white male salespersons, and was instead told to start "cold calling." This involved looking up institutional money managers, hedge funds, mutual funds, and pension funds in a directory, calling them without any introduction, and informing them of Howard Weil's research and analysis products.

55.     Upon information and belief, when similarly situated white male salespersons, with thesame experience and skill, started at Howard Weil before Plaintiff, all of them were given a "book of business," but Plaintiff was not given one because Howard Weil did not believe that a woman should be working there, or that she would succeed there because she was a woman. The fact that she was not given a "book of business" meant that she spent more time generating business and was directly related to her receiving lower compensation than the white male salespersons.

**Plaintiff is Told a Woman "Can't Handle" Lucrative Accounts, and her Accounts Are Re-assigned to a Man**

56.     During her first year, Plaintiff was highly successful and generated $500,000 in

business, despite the fact that Howard Weil gave her *no* accounts. She used her significant contacts to generate business in the Mid-Atlantic, North Carolina, and Virginia.

57.    In or about 2005, John Doe #6 ("Co-worker Doe #6") joined the sales team and was immediately given a book of business, unlike Plaintiff. Co-worker Doe #6 had the same or similar experience to Plaintiff when he was hired, was hired for the same tasks and given the same responsibilities. Howard Weil gave Co-worker Doe #6 all of the clients in or around Boston, Massachusetts ("the Boston accounts"), which was one of the most desirable territories at Howard Weil and gave Plaintiff, who had one year more of experience in sales at Howard Weil than Co-worker Doe #6, the accounts in Minnesota and Wisconsin ("the Mid-west accounts"), which were one of the least desirable territories.

58.    Plaintiff approached Partner John Doe #3, a partner who was influential at Howard Weil, and said that this wasn't fair because she had not been given a book of business when she started, and she deserved the Boston accounts based on her success. Partner Doe #3 told her that Howard Weil did not think that a woman "could handle" the Boston accounts.

59.    Later in 2005, two white male salesmen, John Doe #7 ("Co-worker Doe #7") and John Doe #8 ("Co-worker Doe #8"), started at Howard Weil.  Both were immediately given a book of business upon their hire, whereas, again, Plaintiff had not been given one upon her hire. Neither Co-worker Doe #7 nor Co-worker Doe #8 had more skills or experience than Plaintiff, and they were hired for the same skills and had the same responsibilities. Most shockingly, Plaintiff was told that she would have to give up the accounts that she generated in the Mid-Atlantic, North Carolina, and Virginia because Co-worker Doe #8 had "friends" there and "had lived" there.

60.    Plaintiff objected to Partner Doe #3 that she should keep these accounts because she had generated them through cold calling and she was from that region and went to college

14

there, but Partner Doe #3 told her that was "just the way it is."

61.     When she continued to push to keep her accounts and pointed out that she was not being treated fairly, Partner Doe #3 told her in no uncertain terms that she should not be seen as a "complainer." Plaintiff was constantly warned that she should not complain about anything if she wanted to keep her job.

62.     Meanwhile, as accounts came up, they continued to be assigned to the similarly situated white male salespersons and not to her. Plaintiff had little opportunity for growth in the company, because Howard Weil refused to give her, as a woman, any lucrative accounts, instead giving them all to white male salespersons. The fact that she was given less lucrative accounts, that her generated accounts were taken away from her, and that she was forced to spend her time looking up accounts for white male salespeople, meant that she had to spend more time trying to generate business, which caused her to receive lower compensation than the white male salespersons.

63.     In addition, two of her colleagues, including Partner Doe #4, threatened Plaintiff to *not dare* "touch" New York or Texas accounts, even though all of the white male salespersons were generating accounts there and more than 75% of Defendant Scotia's clients were located there.

64.     In addition, Partner Doe #4, who was responsible for assigning meetings with clients in New York, purposefully assigned all of the best meetings to white male salespeople and sabotaged Plaintiff by refusing to give her sales meetings, or, when forced to, giving her the least number or least desirable meetings. Plaintiff had to wait for Partner Doe #4 to offer her meetings at the last minute, when he could not find a white male salesperson to take the meeting. Of course,

meetings led to sales, and sales led to commissions[3].

65.    Plaintiff was told that Partner Doe #4 regularly demanded to see records of Plaintiff's marketing meetings but did not examine the records of her white male colleagues.

66.    Over the years, Plaintiff repeatedly complained to President Doe #3 about Partner Doe #4 discriminatorily denying her meetings, stating: "Does [Partner Doe #4] not like women?" and "Does [Partner Doe #4] not like me because I am a woman?" and "I think he is threatened by me because I am a woman." President Doe #3 acknowledged that Partner Doe #4 did not think women should be in a professional setting, but said there was nothing he could do.

67.    As a result of the blatant gender discrimination and unequal treatment, Plaintiff had significantly less opportunity to earn commissions and bonuses.

**Plaintiff Reports Sexual Harassment by a Colleague**

68.    In or about September 2007, one of Plaintiff's white male colleagues touched Plaintiff's feet in a sexual manner on a business plane ride, and she recoiled in horror. Plaintiff was scared that if she complained she may be out of a job and so she tried her best to ignore the sexual harassment. When it escalated, with incessant emails, Plaintiff finally reported it and the harasser was ultimately terminated.

69.    Plaintiff was thereafter-and throughout her employment at Defendant Scotia-labeled as a "complainer" and a "reporter," and experienced hostility in the office from the white male salespersons.

**Plaintiff Gains a New Female Colleague, Rumors Circulate they are in a Lesbian Relationship**

70.    Plaintiff attended business school with an exceptionally successful female

---

[3] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaints.

salesperson (hereinafter referred to as "the Only Other Female Salesperson"), who worked at another energy investment boutique firm.

71.     In or about February 11, 2009, the Only Other Female Salesperson joined Howard Weil.

72.     Soon thereafter, Plaintiff became aware that a rumor was circulating among the white male salespersons that because she and the Only Other Female Salesperson were friends and colleagues, they were in a lesbian relationship. Plaintiff was appalled to be accused of sleeping with a co-worker and disgusted by the knowledge that their white male co-workers imagined and discussed sex acts between them. Upon information and belief, comments about their alleged "affair" continued throughout their employment.

### Partner Doe #4 and Partner Doe #8 Create and Promote a Highly Misogynist and Hostile Environment for the Women in the Office

73.     Upon information and belief, Partner Doe #4 promoted the idea that Plaintiff and the Only Other Female Salesperson were in a lesbian relationship.

74.     Partner Doe #4 and Partner Doe #8 were ringleaders in the office and went out of their way to single out and humiliate their female co-workers. They told disgusting misogynistic jokes about women, watched YouTube videos on their computers of women in various stages of undress, and commented on women's bodies, attractiveness, their "boobs" (breasts) and whether they had had plastic surgery.

75.     The men in the office were extremely vocal about their disparaging views of women, especially working women, and referred to women as "c*nts," "sluts, "smoke shows" and "bitches."

76.     They constantly used binoculars that, upon information and belief, were brought to the office for the purpose of staring at women in bathing suits at the pool across the way, and made

disgusting and demeaning comments about the women's bodies.

77.     They encouraged the other men in the office to disparage women and constantly made Plaintiff, The Only Other Female Salesperson, and other female employees feel humiliated.

78.     It was regularly stated that "only tall, white men from the Southeast" who could "talk about football and the SEC, that drove fast cars and wore nice suits" should work in their field.

79.     White male employees regularly made racist comments about hiring analysts who were minorities and made fun of anyone who had a non-American accent.

**Defendant Scotia Takes 30% of Plaintiff's Commissions**

80.     Also, in or about 2009, Partner Doe #3 was elevated to President of Howard Weil ("President Doe #3"). In his new role, President Doe #3 continued to observe blatant gender and race discrimination but failed to act.

81.     In or about 2009, Plaintiff was informed by Defendant Scotia that she would be receiving some new accounts, but that Defendant Scotia would be taking 30% of her commissions even though she would do all of the work on those accounts. In comparison, at the same time, Defendant Scotia transferred some lucrative New York accounts to Partner Doe #4 but did not take a percentage of those commissions from Partner Doe #4.

82.     Upon information and belief, Defendant Scotia did the same thing to the Only Other Female Salesperson, and continued to take commissions from them both for many years.

**Plaintiff Objects to the Gender Discriminatory and Hostile Environment
to President Doe #3**

83.     Plaintiff repeatedly objected to the gender-discriminatory hostile work environment to President Doe #3. She told President Doe #3 that the sexist comments, blatant misogyny and inappropriate behavior were unacceptable to her, and that the environment was

18

unfair to women. She also objected that Partner Doe #4 and Co-worker Doe #8 treated her and other women with disrespect and hostility.

84.     President Doe #3 bizarrely told Plaintiff that he could do nothing for her, but that he had "brought her" The Only Other Female Salesperson so that she and Plaintiff could "take care" of each other, and that they were "on their own." Partner Doe #3 continually said that he was "happy" that she and The Only Other Female Salesperson "had each other" when Plaintiff complained about the sexist and discriminatory work environment.

**Plaintiff Outperforms the Men in the Office-But is Still Paid Less**

85.     Despite the constant misogynistic and hostile work environment, roadblocks, unfair assignments, lack of assistance and efforts to sabotage her, Plaintiff continued to excel. Still, frustratingly, she was given less opportunity than her white male counterparts, which directly impacted her compensation.

**Plaintiff is Questioned by Defendant Scotia on Whether She Can Be a Working Mother**

86.     In or about late 2011, Plaintiff informed her colleagues, including President Doe #3, that she was having triplets via a surrogate, and that the babies were due in May of 2012. President Doe #3 repeatedly asked Plaintiff whether she would "really" continue working after she became a mother. She always answered that yes, she would continue her career as planned.

87.     The white male salespersons, including Partner Doe #4, made constant comments that Plaintiff would "quit" when she became a mother,  insinuating that it was morally questionable for her to work and be a mother at the same time, and that she would be a bad mother if she did so.

88.     Plaintiff was terrified for her job and worked even harder than ever, scared that as soon as she became a mother, Howard Weil would find an excuse to fire her.

89.     Plaintiff was at no point informed of or given any information on maternity leave.

## Plaintiff Is Refused Maternity Leave

90.     On or about March 18, 2012, Plaintiff's babies were born prematurely at 28 weeks. Plaintiff raced to the hospital in Atlanta, Georgia to care for her critically ill children.

91.     Although her bosses knew that Plaintiff had three newborn premature babies in critical condition, she was told she needed to continue to work on the Annual Energy Conference which was to be held the following Sunday, March 25th.

92.     On or about March 20, 2012, one of Plaintiff's baby's lung collapsed, and Plaintiff called President Doe #3, told him what had occurred. He told her that Defendant Scotia management would be in attendance at the Annual Energy conference, they were her new bosses now and Defendant Scotia expected her to attend. He additionally said "we need you at the conference," and said she needed to work as much as she could up to the Annual Energy Conference. President Doe #3 told her to set up meetings at the Annual Energy Conference. Because President Doe #3 made it clear that Defendant Scotia was not going to allow her to have time off, Plaintiff had no choice but to continue working even though her children were fighting for their lives[4].

## Howard Weil and Defendant Scotia Formally Merge

93.     On or about April 18, 2012, Defendant Scotia came to own Howard Weil as a subsidiary. Plaintiff became part of Scotia's Energy Equity Team for Global Banking Markets which operated out of New York, New Orleans, Toronto, and Houston. Plaintiff was expected to and did regularly travel to and work from the New York, Houston, Toronto and New Orleans offices.

---

[4] As a result of their investigation into her complaints, Defendant Scotia informed Plaintiff that a recommendation would be made for a policy change with regards to Defendant Scotia's maternity leave policy.

94.     The Louisiana-based employees such as Plaintiff learned that the Energy Equity Team would include Defendant Scotia employees in the Toronto and New York offices and New Orleans HR functions were run through Defendant Scotia's New York office. Thereafter Plaintiff worked regularly in both New York and New Orleans.

95.     Defendant Scotia instructed Plaintiff to travel to New York City to meet with Jim Morris, Head of US Trading and Sales, ("NYC Managing Director Morris"), at Defendant Scotia's American headquarters and visit the headquarters to get to know the different business lines that Defendant Scotia offered.

96.     She was told to focus on cross selling products and to also spend time with Defendant Scotia's Head of Global Prime brokerage business and the NYC Equity and Other Product Team members to work on setting up prime brokerage accounts, and to meet with other Equity and other Product Teams' members to learn about selling derivatives and credit and other product lines Scotia offeredin New York.

97.     Plaintiff was excited and hopeful that Defendant Scotia, an international corporation with a New York City headquarters, with over 75,000 employees, would have a sophisticated Human Resources department and a myriad of in-house counsel, and forbid the blatant gender discrimination, pay disparity, and sexual harassment that she had long been subject to.

98.     To her great disappointment, Plaintiff quickly learned that she was mistaken, as Defendant Scotia accepted, endorsed, and supported the discriminatory behavior which had long existed at Howard Weil and further subjected Plaintiff and others to additional gender and race discrimination, especially in the New York office.

99.     As Plaintiff became more familiar with her new employer, she realized that before

she and the Only Other Female Salesperson were grandfathered into Defendant Scotia via a merger, Defendant Scotia Scotiabank had, upon information and belief, just one female Salesperson in its entire Global Banking & Marketing operation-and little to no female leadership. There was also a lackof people of color throughout Defendant Scotia and especially in leadership roles, which were almost exclusively reserved for white men.

100.    Plaintiff at least hoped that Defendant Scotia's more corporate structure would eliminate the grave pay disparity that she had long suffered, but she was extremely disappointed to learn that she would now be earning a discretionary bonus instead of commissions, and further learned that Defendant Scotia would use her sales numbers from the three years prior, which were of course, artificially low, to set her pay. This method ensured that the equal pay problem would continue unabated. Upon information and belief, the Only Other Female Salesperson suffered a similar fate.

101.    President Doe #3 promised that Defendant Scotia would nonetheless also value her contribution and not just her numbers-implying that "legacy" salespeople who had earned a huge income without doing much work would no longer see huge payouts and people who worked hard but did not have legacy accounts generating automatic income would see larger payouts.  Plaintiff was hopeful that her work would finally be properly rewarded and that Defendant Scotia would ensure equal pay.

### Defendant Scotia Denies Plaintiff Leave for Her Premature Triplet Babies

102.    Thereafter, Plaintiff was forced to work full-time and long hours as she had done before the babies were born, and to travel extensively throughout the first months of her babies' lives, even though they were in critical condition and needed constant care.

103.    Instead of lightening up her workload and offering assistance to her due to the

arrival and serious medical needs of her three children, Defendant Scotia requested that Plaintiff be in attendance for a number of work trips and make a large number of outbound calls to external clients of Defendant Scotia and have a large number of calls with Defendant Scotia employees in New York City and Toronto to develop relationships. She traveled a number of times to Toronto and New York in late May and early June, despite the babies' serious health issues. In early July, she was the only New Orleans based salesperson required to fly to Calgary for a Defendant Scotia event.

104.    Defendant Scotia made it clear that Plaintiff was not welcome to take leave to care for her children if she wanted to keep her job. Upon information and belief, men who have premature babies and/or extremely ill children-- and even men who have one healthy baby-- are allowed to miss work at Defendant Scotia without having their jobs threatened or their commitment tested.

### Defendant Scotia Harasses Plaintiff for Having Childcare Duties

105.    While her children were still in critical condition recovering from their premature birth in another state, Plaintiff worked remotely in order to take care of them. On their first night leaving the hospital after 60 days, her son was rushed to the Emergency Room in an ambulance because he stopped breathing. When Plaintiff informed Partner Doe #3 of the medical emergency, he asked when she was coming back to work. He continued to pressure her continuously because Defendant Scotia was monitoring her behavior more closely than others. Fearful of losing her job, Plaintiff continued to work relentlessly on behalf of Defendant Scotia, and was gaining lucrative outcomes for Defendant Scotia.

106.    Each time that President Doe #3 spoke to Plaintiff, he asked when she was coming back to the office, as if Defendant Scotia was doing Plaintiff a "favor" by allowing her to work

remotely to take care of her children who were still extremely fragile. Upon information and belief, President Doe #4 was pressured by Defendant Scotia to push Plaintiff to return to the office.

107.    Defendant Scotia continued to put pressure on Plaintiff and monitor her when she returned to the office. Plaintiff was told that, whenever she was out of the office President Doe #3 constantly discussed the fact that she was out of the office and demanded to know,"Where is [Plaintiff]" and "When is she coming back to the office??" or saying, "Emily is always out sick with her kids," even though she was not out sick.

108.    President Doe #3 did not demand that white male salespersons come back to the office while caring for an ill relative/child, nor did he surveil any of the white male salespersons' whereabouts during leave, a family emergency, or at any point whatsoever.

109.    In fact, the white male salespeople regularly missed work to go golfing and neither President Doe #3, nor anyone in the NYC office, ever said a word about any of the men missing work to golf. Partner Doe #4 took most Fridays off, left every summer for at least one month to live in Carmel, California and left for two weeks at Christmas to travel to Hawaii in addition to other personal travelling and was never questioned. Many other salesmen worked from other cities in the summertime and President Doe #3 never said a word.

110.    In early July after travelling to New York and Toronto and, even though her babies were still extremely fragile, Plaintiff was ordered by Defendant Scotia to go to the Scotia Energy Conference in Calgary which was a fourteen-hour trip from South Carolina.  She was told that her attendance was "not up for discussion."

### Managing Director Morris, based in New York City, Excludes Plaintiff

111.    After Defendant Scotia took over the New Orleans office in or about 2012, NYC Managing Director Morris traveled from Defendant Scotia's New York City office to New

Orleans approximately at least once a month for several days to oversee Defendant Scotia's New Orleans location for the New York Office.

112.     Each time NYC Managing Director Morris traveled to Defendant Scotia's New Orleans location, he invited white male salespersons to dinners, bars, and networking events, at which he would talk about Defendant Scotia's business and salespersons' accounts and give industry updates. For years, NYC Managing Director Morris never invited Plaintiff or The Only Other Female Salesperson to these dinners. These business dinners resulted in the white male salespersons having additional access to NYC Managing Director Morris, and Director Morris favoring their male peers. This meant Plaintiff could not learn of new opportunities, business prospects, and advancement at Defendant Scotia and in the field.   Upon information and belief, Plaintiff and the Only Other Female Salesperson were not included because of their gender.

113.     Additionally, whenever Plaintiff was in New York, attending to her New York City clients and working in Defendant Scotia's New York office, NYC Managing Director Morris did not interact with her  New York City based clients for business outside of the office, even though he regularly engaged with white male salespersons and their clients for business outside of the office, including expensive golf, hunting outings and fishing trips. Her obvious exclusion was also humiliating and demoralizing and led to her white male colleagues in New York and New Orleans treating her with even less respect, as it was clear that Defendant Scotia did not value the female salespeople that they had been stuck with as a result of the merger.

114.     It was very clear to Plaintiff and to all of her co-workers that the gender based lack of inclusion and disparate treatment was going to continue.

115.     The impact of this exclusion led to more snowballing pay disparity over time and impacted her book of business in New York and in New Orleans as well as her career and

earning potential.

116.    Even though Plaintiff regularly was one of the highest performers in the office, she was not paid  for her contributions in comparison to the way her white male peers were compensated. While she was well compensated, she was regularly short-changed and should have been paid more and upon information and belief, would have been given more opportunity and paid more if she were a man.

117.    Plaintiff went to President Doe #3 to object to being so blatantly and obviously excluded from dinners with NYC Managing Director Morris. Plaintiff told President Doe #3 that Defendant Scotia was "sidelining" her and asked why she was not being invited to events and activities to which white male employees in New York and New Orleans were invited.

118.    In response, President Doe #3 said that NYC Managing Director Morris was not including Plaintiff because Director Morris said she was a "mom" and "had little kids" as if that explained the disparity.  Plaintiff was shocked and appalled about NYC Managing Director Morris's position, because NYC Managing Director Morris also knew that many of her white male coworkers still had young children, and they were still invited. NYC Managing Director Morris also knew that she was often forced to go on long trips, even when her children were hospitalized, and the she often had to attend evening events with clients-but no one at Defendant Scotia was worried about her children then.

119.    Plaintiff knew that being excluded from these meetings, opportunities, events and activities in New York and New Orleans would further widen the pay disparity between herself and her white male colleagues.

**Defendant Scotia Continues "Taxing" Plaintiff**

120.    After the merger, much to Plaintiff's frustration, Defendant Scotia continued to

"tax" Plaintiff's accounts, taking a significant percentage of her commissions.

## Plaintiff Complains of Her Discriminatory Bonus

121.    Despite being denied opportunities for advancement and the same lucrative accounts or meetings than the white male salespersons, Plaintiff continued to find ways to be successful at Defendant Scotia. Still, the pay disparity continued, and Plaintiff soon learned that her 2013 annual bonus was, upon information and belief, significantly smaller than many of her white male counterparts whom she had outperformed.

122.    During her 2013 bonus meeting in December of 2013 and after that in additional conversations, Plaintiff complained to President Doe #3 and a Toronto Managing Director that she had received a lower bonus as a percentage of what she had contributed versus her white male colleagues. She told them that she firmly believed that the only reason her bonus was lower than it should have been versus Partner Doe #4's and other white male co-workers was because she is a woman. Toronto Managing Director McCartney stated in response, "We thought you would be happy with your bonus," as if she was lucky to have received it, she did not deserve to earn any more, and as a woman they had assumed she would be satisfied.

123.    When she continued to object, and said that her bonus should be based on her production and performance, they emphasized again that they "thought [she] would be happy," as if they assumed a woman would be happier with a lower bonus.

124.    Eventually, she was told that she was valued by Defendant Scotia and that they would "make it up to her" the next year.

## The Hostile Work Environment Continues Unabated

125.    Throughout 2014, Plaintiff continued to be subjected to a sexist, white male-dominated, misogynistic and hostile work environment at Defendant Scotia and continued to be

excluded from many important work events.

126.    Her white male co-workers, including Partner Doe #4 and Co-worker Doe #8, continued to make outdated, discriminatory, and sexist remarks about women in the workplace.

127.    The white male salespersons also continued to regularly comment on her appearance. They called her a "slut" and Partner Doe #4 stated that the white male clients "only deal with her because she "is a woman."

128.    White male salespersons at Defendant Scotia continued to refer to female (and minority) politicians in a derogatory and discriminatory manner, using gender and race-based stereotypes to describe them.

129.    In 2014, Plaintiff received a larger bonus that for once seemed related to her performance. Upon information and belief, the higher bonus was an attempt to make her whole for the prior years and so that she would not leave Defendant Scotia. Still, Defendant Scotia made it clear that she was "lucky" and that she should be grateful that they had decided to give her a large bonus. Plaintiff made it very clear that it was not luck, but that she had earned and deserved the entire bonus for 2014.

**Plaintiff Does More Work Than White Male Salesperson But is Paid Less**

130.    In or about 2015, NYC Managing Director Morris, President Doe #3, and Research Director John Doe #12, ("Director Doe #12") begin to rely on Plaintiff to be the main liaison between research and sales. Plaintiff worked closely with President Doe #3, Director Doe #12, and NYC Managing Director Morris to make business and management decisions for Defendant Scotia.

131.    In her bonus meeting for 2015 with NYC Managing Director Morris and Partner Doe #3, though Plaintiff had extremely high production numbers for that year and had been doing

managerial work, Plaintiff was told her bonus would be less as the team was "paid down." However, her bonus compensation was again, upon information and belief, decreased at a far higher percentage than her white male co-workers regardless of the strong work that she had produced at Defendant Scotia. Everyone on the team was "paid down" from the year before, but Plaintiff was dramatically paid down despite her stellar performance.

132.    Again, Plaintiff objected to the blatant gender-based pay disparity. NYC Managing Director Morris expressed annoyance that Plaintiff was again complaining and told her that she should be grateful have gotten the pay she received, as if Plaintiff had not earned the money. Plaintiff was devastated to be told that she could not raise concerns about her pay relative to her performance and relative to her white male peers.

133.    After the meeting, Plaintiff spoke with a manager about her concerns with her pay for that year. He told her that she was "lucky" to have her job, and that she had a "two-income family" rather than the salesmen, who supported their families on their income alone. Plaintiff was further devastated to be told that she could not be paid as much as her white male peers because, according this Defendant Scotia manager, she had a husband to support her, and her white male coworkers had wives to support.

**Plaintiff is Told She is a "Star" and Has a "Bright Future" at Defendant Scotia**

134.    In or about 2016, the energy business came under pressure from a regulatory and macro perspective. In early 2016, 5 of the 45 employees in Defendant Scotia's New Orleans office were laid off.

135.    Because the business was declining, and women were so devalued at Defendant Scotia, Plaintiff was concerned about her future compensation given the overwhelming gender discrimination she faced and declining profits in the industry.

136.    Plaintiff asked President Doe #3 about the bank's opinion of her and how she would be compensated in the future given that she was disappointed with her bonus from the previous year. She was relieved when President Doe #3 told her that Defendant Scotia Management believed she was a "star," thought "highly of" her, and were very aware that she had extremely high sales numbers.

### Defendant Scotia Hires a White Male Director of Research

137.    In or around Fall 2016, in an apparent effort to stabilize their business, a decision was made to name a new Director of Research, Ben Isaacson ("Director of Research Isaacson") at Defendant Scotia, who, not surprisingly, was a white male. Upon information and belief, Director of Research Isaacson was hand-picked to be promoted to the role by Head of Global Banking Haskins.

### The Hostile Work Environment Continues

138.    Meanwhile, throughout 2016, the misogynistic hostile work environment continued unabated. White male employees in both offices still openly objectified women and objectified and abused their female co-workers. Some white male employees regularly openly referred to people as "pussies." The white male employees in both offices criticized Hillary Clinton and other female politicians and celebrities in a misogynistic way.  Plaintiff and the Only Other Female Salesperson continued to be excluded from social and business events in both New York and New Orleans and Partner Doe #4 continued to assign meetings in a way that was discriminatory to Plaintiff and the Only Other Female Salesperson and excluded them from opportunities.

139.    White male co-workers in the New Orleans office constantly stated that anything having to do with the rearing of their children was "not their department," and acted as if only their wives had any responsibility for their children-- thereby implying that Plaintiff and the Only Other

Female Salesperson were bad mothers and bad employees because they were working mothers.

140.    In or about the Fall of 2016 Plaintiff and the Only Other Female Salesperson both objected to Managing Director Morris and Partner Doe #3 about the hostile environment they were continuously subjected to.

**Instead of Assigning Coveted Business from a Retiring Partner to Plaintiff, Defendant Scotia Hires a New White Male Salesperson**

141.    In or about 2016, a retiring former Partner, who had a huge book of coveted business, left the firm, which meant his business would be reassigned to other salespeople. Plaintiff was extremely hopeful that after a decade of dedication, and top performance, she would finally be rewarded with at least some of the larger coveted accounts, including some of the best New York accounts.

142.    Instead of assigning the accounts to existing employees including Plaintiff, Defendant Scotia hired a white male employee, John Doe #10 ("Co-worker Doe #10") to take over the vast majority of the retiring Partner's coveted business and assigned the remaining accounts to white male employees.

143.    Upon information and belief, Defendant Scotia did not post the role or consider any women or any people of color for the role and instead simply hand-selected a white male to hand the coveted accounts off to.

144.    Upon information and belief, unlike Plaintiff and the Only Other Female Salesperson, Co-WorkerDoe #10 was not "taxed" and did not have to make cold calls or build his book of business or "prove himself." Co-worker Doe #10 was simply assigned highly lucrative accounts, at least some of which should have been assigned to Plaintiff. Upon information and belief, Co-worker Doe #10 was also given financial guarantees, which Plaintiff never received. Upon information and belief, after Co-worker Doe #10 received the accounts, he did not grow or

maintain the business.  Most of the accounts declined over a one to three year time frame under Co-Worker Doe #10.

145.    The remaining top accounts went to three white male employees.  All of the white males who were assigned the lucrative accounts got to spend even more time in New York, servicing more lucrative accounts and interacting more frequently with the decision makers and leaders in the New York office.  None of the lucrative accounts were assigned to Plaintiff or the Only Other Female Salesperson, upon information and belief, they were passed over due to their gender.

146.    Adding insult to injury, Co-Worker Doe #10 was embraced by his white male co-workers and invited to out of office and social events and activities in both New York and New Orleans, and his opinion was immediately sought after, while Plaintiff and the Only Other Female Salesperson continued to be ignored and excluded from social and business opportunities.

**NYC Managing Director Morris Threatens Plaintiff's Job When She Points out Gender Pay Discrimination**

147.    In or about December 2016, after Plaintiff and her similarly situated white male colleagues spoke openly about their year-end bonuses, Plaintiff *again*, upon information and belief, received a lower bonus than her similarly performing white male colleagues, and one that was not even remotely commensurate with her production at Defendant Scotia. In addition to not being given as many opportunities to make commissions, and not being compensated at the same scale as her white male coworkers, she was also not compensated for her overall effort which was above that of her white male co-workers.

148.    Plaintiff, extremely frustrated, complained to NYC Managing Director Morris in a meeting about commissions and addressed the gender pay inequity, explicitly stating, "I am being paid less because I am a woman." She also stated, "I have contributed more than the men and you

are paying me down more than them because I am a woman."

149.     NYC Managing Director Morris became furious with Plaintiff, and angrily told her that he "didn't want to hear it." He told her that she "was lucky to be paid what she was paid" and that she "should be appreciative."

150.     In a conversation with another manager, he stated that Plaintiff was "lucky" and she "reminded" her, "You are a woman and you have a husband to support you."

151.     Though he had begun to begrudgingly include her in some firm dinners by that time, on that particular evening, NYC Managing Director Morris made a show of inviting a group of white male salespersons out to dinner, and made a point of specifically excluding Plaintiff yet again. Plaintiff knew that she was being punished for objecting to the gender-based pay disparity and discrimination. President Doe #3 later confirmed that NYC Managing Director Morris did not want her at dinner because she had complained about her disparate pay.

152.     Thereafter it was reported to Plaintiff that NYC Managing Director Morris later had dinner with Partner Doe #4 and another trader in Toronto and told them Plaintiff better "back it down" and "stop bitching and complaining" And that he had also bitterly complained about her disparate pay objections to staff in New York City, thereby humiliating and embarrassing her, and causing her further alienation with her co-workers and managers in the Scotia New York office.

153.     Sometime after the bonus meeting, in or about December 2016, President Doe #3 met with Plaintiff and told her that NYC Managing Director Morris was "pissed," and that he was worried for her.  He repeated that NYC Managing Director Morris was "furious" and warned her in no uncertain terms that she should be "careful in speaking out," and that her "job was in jeopardy."

154.     Plaintiff, frustrated, reminded President Doe #3 that, as he well knew, what she was

saying was true: she was paid down more on a percentage basis more than her white male co-workers in New York and in New Orleans for her overall contribution to the firm.

155.    Also in or about December 2016, The Only Other Female Salesperson warned Plaintiff that President Doe #3 told *her* that NYC Managing Director Morris was "pissed" that Plaintiff was not "more grateful" for her bonus, and that Plaintiff needed to "shape up fast" because her behavior was "not how you act" at Defendant Scotia and indicated that her reputation in New York City had taken another hit He told The Only Other Female Salesperson that Defendant Scotia liked employees who were "team players." It was obvious that women who objected to men being paid more than they were are not considered team players at Defendant Scotia.

156.    Upon information and belief, NYC Managing Director Morris was warning Plaintiff that she should not complain about gender disparity if she wanted to keep her job.

157.    Upon information and belief, NYC Managing Director Morris told Plaintiff's managers in New Orleans, New York, and Toronto that Plaintiff was complaining about her bonus relative to the white males.  Upon information and belief, and Defendant Scotia supported his retaliatory threats and punishments against her in response.

158.    In the fall of 2016, Co-worker Doe #8 openly complained that he did not like that his child's school teacher was a pregnant lesbian and stated that it was inappropriate for kids in kindergarten to have a teacher who was homosexual. Plaintiff was appalled.

159.    In the fall of 2016, Plaintiff was very upset for The Only Other Female Salesperson and the way they were both treated versus men with regards to time off. The Only Other Female Salesperson worked remotely while receiving medical treatment. Plaintiff knew that The Only Other Female Salesperson was working because they were constantly communicating about work. The Only Other Female Salesperson was nonetheless told she had to take the time off as vacation

days, even though Partner Doe #4 regularly worked remotely from California and Hawaii and did not have to take vacation days.

**Partner Doe #3 Instructs Plaintiff to Obtain a Series 24 License in Order to Step into a Future Managerial Role**

160.     On one occasion in 2016, President Doe #3 told Plaintiff that she was "highly valued" by the firm and that she had a great future ahead of her at Defendant Scotia. President Doe #3 instructed Plaintiff to take the Series 24 exam so she would be able to step into a managerial role in the future. The Series 24 license was necessary for Plaintiff (or any individual) to manage activities at a firm like Defendant Scotia. Plaintiff informed President Doe #3 that she would do sobecause she was highly interested in having a management role at Defendant Scotia.

161.     On her own time, Plaintiff spent two months studying for the Series 24 exam and even flew to Florida to take a course to help her with the exam.

162.     In or around 2016, Plaintiff took and passed the Series 24 exam and obtained the Series 24 license.

**Plaintiff is Passed Over for More Lucrative Accounts**

163.     Business continued to decline throughout 2016 and in the beginning of 2017 several more employees were fired, including several analysts. It was a poor work atmosphere generally and Plaintiff tried to improve morale by acting as a liaison between research and sales.Research in particular was in a state of despair. Defendant Scotia's decision to put Director of Research Isaacson in charge was failing miserably, which was no surprise, since he had no former management experience or experience in energy.

164.     Making matters worse, Director of Research Isaacson was extremely hostile and demeaning to the female support staff.  Upon information and belief, he regularly made the female support staff members cry and treated them so badly that one female staff member quit.

165.    The analysts became increasingly frustrated and threatened to leave due to his incompetence. Plaintiff spent a lot of time communicating these concerns to NYC Managing Director Morris and President Doe #3, who then communicated them to Defendant Scotia's Head of Global Banking Haskins. It was clear that Director of Research Isaacson needed to be let go but inexplicably, he was not.

166.    For example, meanwhile in or about January 2017, when some salesmen were let go, the "Invesco Houston" account became available, and this was inexplicably given to Co-Worker JohnDoe #11, a white male salesperson who, upon information and belief, Defendant Scotia had deemed a poor performer. The decision was especially bizarre because Plaintiff already had accounts with Invesco in Toronto and in fact covered multiple accounts in Houston, Texas.

167.    Upon information and belief, Plaintiff was denied the accounts in retaliation for complaining about gender discrimination and pay disparity. Instead, Plaintiff was assigned non-lucrative accounts in Chicago, Illinois.

168.    Upon information and belief, Plaintiff was punished for complaining about unequal treatment by being subjected to even more inequality.

**Plaintiff Performs the Role of Sales Manager, Without the Title or Compensation**

169.    After she dared to complain about gender discrimination and the blatant pay disparity, Partner Doe #3 and NYC Managing Director Morris began piling extra, administrative work on Plaintiff, who thereafter was basically asked to perform the role of Office Sales Manager.

170.    She handled the creation of a product that was used by all salespersons for the next three years, dealt with account questions, researched issues, planned Defendant Scotia's annual conference, and escalated work complaints of her colleagues to management. A "Morning Line Committee" was created by NYC Managing Director Morris with four other members of the team,

but Plaintiff essentially did all of the work. In particular, Co-worker Doe #8 refused to help and in general did very little to contribute to any task that was assigned to him but would often take credit for Plaintiff's work.

171.    To her humiliation, after she made NYC Managing Director Morris "furious" by objectingto pay disparity, she was also forced to do tasks that Defendant Scotia clearly considered to be "women's work," as well as all of the administrative and managerial work she had long been asked to do.

172.    Fearful of losing her job, Plaintiff did all the work she was asked to do and did it well. The office began to run extremely efficiently. Nevertheless, Plaintiff was never promoted to a higher position, even though her administrative workload-and value added-was far greater than her white male counterparts.

<b>Even after Plaintiff Reports Discrimination,<br>
<u>Defendant Scotia Promotes the White Male Discriminator to the Manager Position</u></b>

173.    In or about the Spring of 2017, President Doe #3 and NYC Managing Director Morris announced that the position of Sales Manager would be open, and that Defendant Scotia would be interviewing candidates. Plaintiff was somewhat offended that she was not simply offered the role as she had been charged with performing the work of the office Sales Manager for quite some time, but given the gender discrimination in play, she was not surprised.

174.    Plaintiff, Partner Doe #4, the Only Other Female Salesperson, and Co-worker Doe #8 were all considered for the role.

175.    Given the blatant gender discrimination and misogyny that went on in the office, Plaintiff knew that she was not likely to even be considered for the job, but she was horrified to think that Co-worker Doe #8 would be chosen for the position when his behavior towards the women in the office was so blatantly abusive and discriminatory.

176.    Plaintiff was so concerned about the way that she and the Only Other Female Salesperson would be treated if Co-worker Doe #8 became their boss that she told President Doe #3 and NYC Managing Director Morris in her interview that even if they did not promote her, they should *not* give the position to Co-worker Doe #8.

177.    She reminded them that he did not work well with women, he talked down to them, he interrupted women, and would ask women a question and would not listen to the answer, which was different than the way he spoke to men. She told them that in addition to his behavior towards her, he saw Co-worker Doe #8 speak to Jane Doe #1, the Marketing Director, derogatorily and order her around, and did not do any of these things to men.

178.    In addition, she stated that Co-worker Doe #8 was also hostile to the Only Other Female Salesperson – he often refused to answer her questions, ignored her, or cut her off when she was speaking, often humiliating her in front of other people.

179.    She further pointed out that he referred to the office assistants as "the girls" in a demeaning manner.

180.    NYC Managing Director Morris told Plaintiff that she "shouldn't worry about it." Upon information and belief, NYC Managing Director Morris was again warning Plaintiff to keep her mouth shut and that he did not care about or value her opinion.

181.    The Only Other Female Salesperson advised Plaintiff that she had also asked Defendant Scotia numerous times not to give the position to Co-worker Doe #8 because he was hostile to women.

182.    Notably, upon information and belief, despite the fact that two women had reported another employee for subjecting them and other female employees to gender discrimination, no investigation was performed, and no action was taken.

183.     Multiple times Partner Doe #4 said to Plaintiff, "[Defendant Scotia] would never make you Sales Manager, they just have to consider you because you are a woman," something that he continued to say as long as they both worked for Defendant Scotia.

184.     Two days later, President Doe #3 told Plaintiff that NYC Managing Director Morris and Defendant Scotia Management had decided to give the promotion to Co-worker Doe #8 (hereinafter "Sales ManagerDoe #8") stating that Sales Manager Doe #8 "had his hand up."

185.     He also stated that Defendant Scotia decided the position was "not right" for her or for The Only Other Female Salesperson at that time because they had "little kids at home." He told Plaintiff that the Sales Manager position was "not all it's cracked up to be," so she "didn't want it anyway."

186.     Plaintiff was horrified. Not only had Defendant Scotia not actually considered her for the role, but they had chosen to promote someone who had just been reported for creating a vicious gender-based hostile work environment and he was being given free rein to control the two female salespeople who had complained about him.

187.     Upon information and belief, NYC Managing Director Morris reported her "complaints" back to Defendant Scotia, who upon information and belief was annoyed and angered that Plaintiff was once again complaining about discrimination.

**Sales Manager Doe #8 Retaliates Against Plaintiff for Her Report**

188.     Upon information and belief, President Doe #3 and/or NYC Managing Director Morris told Sales Manager Doe #8 that Plaintiff had reported his sexist, discriminatory, and hostile behavior to women and told Defendant Scotia that he should not be hired as Sales Manager. Upon information and belief, they did not counsel or question him about the accusations against him, investigate the allegations against him, or report his behavior and the allegations against him to

Human Resources.

189.    Sure enough, in or about the end of 2017, as soon as Sales Manager Doe #8 became Plaintiff's manager, his hostility escalated, and he often responded to her in a belittling manner when Plaintiff spoke to him about necessary job-related topics. Prior to her reporting his gender discrimination, Sales Manager Doe #8 had not treated her with such hostility.

### NYC Managing Director Morris assures Plaintiff She Will Be a Managing Director

190.    In or around late 2017, NYC Managing Director Morris called Plaintiff to discuss her future at the firm.

191.    NYC Managing Director Morris assured Plaintiff that she was doing excellent work for Defendant Scotia, that she had a bright future with the firm, and informed her that the company wanted to make her a Managing Director, a higher paying position that would garner her more respect within Defendant Scotia.

192.    Upon information and belief, NYC Managing Director Morris only made this assurance to keep Plaintiff at the firm, as he recognized she was underpaid and underutilized, but knew Defendant Scotia would do nothing to change that since Plaintiff is a woman.

### Plaintiff is Snubbed By Defendant CEO Jake Lawrence Due to Her Gender

193.    In or about early fall of 2017, Defendant CEO Lawrence came from New York to New Orleans to meet with Scotia employees and invited them to meet at a bar called "Bornge."

194.    Plaintiff was informed that there would also be a small dinner with Defendant CEO Lawrence afterwards.   President Doe #3 told Plaintiff that they all needed to make a good impression on Defendant CEO Lawrence and that the dinner was important.

195.    Plaintiff and all of her Scotia co-workers were excited about the opportunity to meet and interact with Defendant CEO Lawrence, as it appeared and was widely believed, that

Defendant CEO Lawrence, was being groomed to one day replace CEO Brian Porter.

196.    Defendant CEO Lawrence was talking to the male salespeople and Plaintiff attempted to also engage Defendant CEO Lawrence. He made some small talk with Plaintiff about his commute and explained that he had been commuting back and forth between Toronto, where he had been working, and New York.  Plaintiff responded that she also spent quite a bit of time in the New York office, and Defendant CEO Lawrence told her that they could touch base sometime when she was in New York.

197.    He did not further engage with Plaintiff. Soon it became apparent that Defendant CEO Lawrence was not including Plaintiff-or The Only Other Female Salesperson-in the dinner scheduled that evening and that, while the only female salespeople were being excluded, male salespeople were invited to the dinner.

198.    Plaintiff had a bad feeling about being sidelined because the message was clear that neither Defendant CEO Lawrence nor her male managers thought she was an important part of the Defendant Scotia Team, even though she was irrefutably a top salesperson.

199.    Upon information and belief, Plaintiff and the Only Other Female Salesperson were not invited to the dinner because Defendant Scotiabank prefers its Salespeople to be white males and favors white male Salespeople.

200.    Additionally, upon information and belief, Defendant CEO Lawrence had already been "warned" that Plaintiff was a "complainer," who regularly objected to gender-based disparities and the hostile work environment to which she was routinely subjected.

**NYC Managing Director John Doe #15 Continues the Sexist "Old Boys Club" Atmosphere**

201.    In or about May 2017, NYC Managing Director Morris was promoted within Defendant Scotia, and in or about September or October 2017, he was replaced by John Doe #15

("NYC Managing Director John Doe #15"), who was also based in Defendant Scotia's New York City office and managed the staff who worked in New Orleans and New York thereafter.

202.    It was widely rumored and discussed that NYC Managing Director John Doe #15 had been fired from a private bank for inappropriate behavior. Upon information and belief, John Doe #15 had been fired from his previous firm for writing a discriminatory email, but Defendant Scotia knowingly chose to hire him anyway. Upon information and belief, Defendant Scotia knew or should have known that NYC Managing Director John Doe #15 would engage in discriminatory behavior.

203.    NYC Managing Director John Doe #15 continued the same "old boys club" that existed under NYC Managing Director Morris.

204.    Upon information and belief, NYC Managing Director John Doe #15 was warned that Plaintiff was an ungrateful complainer, who regularly "played the gender card" and who was difficult to work with.

205.    Additionally, except for one introductory meeting when he first started, NYC Managing Director Morris refused to meet with Plaintiff's New York City clients, though she regularly asked him to do so between 2017 and 2019 and though he met with white male salespeople's New York clients.

### Several Scotia Employees Come to the Office Dress as Confederate Soldiers for Halloween

206.    To Plaintiff's  disgust, three of her white male co-workers, including Partner Doe #4, came to the office dressed as Confederate Generals for Halloween.

207.    As usual, their blatant discriminatory behavior was completely endorsed by Defendant Scotia.

208.    Pictures of these employees in their costumes were widely circulated at Defendant

Scotia and even sent to clients. Upon information and belief, higher-ups at Defendant Scotia, including NYC Managing Director John Doe #15, were well aware of these costumes and condoned and endorsed them.

### Plaintiff and The Only Other Female Salesperson are Viewed as"Token" Interviewers

209.    Meanwhile Defendant Scotia continued to fail to hire women or minorities and the boys club network continued.

210.    In or about 2017, Plaintiff and the Only Other Female Salesperson were repeatedly required to participate in job interviews to, upon information and belief, project the false impression that there was gender parity at Defendant Scotia. Nevertheless, even after participating in the interviews, Plaintiff and the Only Other Female Salesperson' s input was disregarded, and their suggestions were ignored by their white male colleagues.

211.    Also, in or about 2017, the Only Other Female Salesperson relayed a story to Plaintiff concerning an interview she had conducted with their white male co-worker John Doe #9 ("Co-worker Doe #9"). The Only Other Female Salesperson and Co-Worker Doe #9 interviewed candidates for a research associate position, and when the Only Other Female Salesperson expressed interest in the sole female candidate, Co-workerDoe #9 looked directly at the Only Other Female Salesperson and said he "was going to hire a guy," that he was "not interested in her opinion" and that the female candidate was only a "token interviewee," justlike she was the "token interviewer."[5]

### Co-worker Doe #9 Adds to the Hostile Work Environment

212.    In or about 2017, Co-worker Doe #9 made sexual and discriminatory comments on

---

[5] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaint and stated that Co-worker Doe #9 "called [the One Other Female Salesperson] a token interviewer in 2016, and said he only interviewed a woman candidate because he had to.

the sales floor in front of the team, including in front of President Doe #3 and NYC Managing Director John Doe #15, such as saying companies would "lift their skirts" "He used the word "pussy" repeatedly across the sales floor, NYC Managing Director Morris and John Doe #15 repeatedly heard Co-worker #9 say "pussy" and witnessed Plaintiff's obvious discomfort with his use of the word but allowed him to use the word and engage in generally misogynistic behavior.

213.    Co-worker Doe #9' behavior continued until he left in December of 2017.

### Plaintiff Gets the Best Client Reviews Out of All of her Peers

214.    In or about the Fall of 2017, President Doe #3 informed Plaintiff that Scotia had given him a survey where Plaintiff's clients voted her a "top salesperson" as compared to all other salespersons at other banks in the industry, including over all of her peers.Despite the constant roadblocks and handicaps she was forced to endure, she continued to perform at an extremely high level-even though she was not properly compensated for doing so.

### John Doe #15 Blatantly Refuses to Act When He Observes the Hostile Work Environment

215.    On or about November 8, 2017, NYC Managing Director John Doe #15 was in New Orleans and he went to a work dinner at La Petite Grocery with several white male employees as well as Plaintiff and The Only Other Female Salesperson. Several of the men began talking about a woman who lived in town who they all knew. The men discussed her appearance in detail and talked about how "hot" she was. Sales Manager Doe #8 called her a "Smoke show." All of the men at the table went on and on about her. Plaintiff was disgusted and humiliated by the blatant objectification- but what was even harder for her to accept was NYC Managing Director John Doe #15's reaction-he held his menu up over his face and said, "I'm not here," and then, "I'm not hearing this conversation." NYC Managing Director John Doe #15 actions gave license to Defendant Scotia's white male employees to act in whatever manner they wished towards women.

His actions also sent amessage to Defendant Scotia's female employees that Defendant Scotia does not care if you are subjected to a hostile work environment, and Defendant Scotia will always just cover its' eyes, play dumb, and look the other way.

### Plaintiff Meets Defendant Scotia in NYC to Report the Hostile Work Environment

216.    Plaintiff was regularly required to attend work meetings in New York City. While she was in New York City, she often reported the hostile work environment that she and others faced on a regular basis. In or about early December of 2017, she met with NYC Managing Director John Doe #15 to specifically ask that some action be taken about the fact that Sales Manager Doe #8 was treating women in the office poorly, that morale was down, and that he was an ineffective and abusive sales manager. Upon information and belief, no action was taken, except that NYC Managing Director John Doe #15 became even more exasperated with Plaintiff.

### NYC Managing Director John Doe #15 Fails to Act After Witnessing Director of Research Isaacson refer to Women as his "fuck buddies"

217.    At one event that she was invited to with all of the white male salespersons, the office Christmas Party on December 14, 2017, NYC Managing Director John Doe #15, Plaintiff, Partner Doe#3 and the Only Other Female Salesperson, who was pregnant at the time, watched as Director of Research Isaacson, pulled out his phone, and began referring to women as his "fuck buddies."

218.    He then swiped through pictures on a dating website and announced that he was going to find someone to meet up with to "fuck." He kept moving his finger on his phone and would say "swipe, next, don't want to have sex with you, swipe right, yes, want to have sex with you," and on and on.[6]

---

[6] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaint and stated Isaacson "described his sex life to other employees at a firm Christmas party on December 14, 2017, and [John Doe #15] failed to address it."

219.    Plaintiff was utterly disgusted by this behavior and indicated so. NYC Managing Director John Doe #15 watched silently, though he later admitted to Plaintiff that Head of Research Isaacson's behavior was "incredibly disturbing and inappropriate." Upon information and belief, NYC Managing Director John Doe #15 did not report Head of Research Isaacson's discriminatory and sexist behavior to Defendant Scotia, nor did he speak to him to ensure that this behavior ceased. Upon information and belief, President Doe #3 informed Head of Global Banking Haskins of this behavior but Head of Global Banking Haskins took no action.

## Plaintiff Objects Again That Her Bonus is Discriminatory

220.    During her 2017 bonus meeting with President Doe #3 and NYC Managing Director John Doe #15 Plaintiff again objected that her bonus was lower than the similarly situated white male salespersons, and that her bonus was not commensurate with her sales production. President Doe #3 said she needed to stop complaining and she could go somewhere else if she was unhappy, as Defendant Scotia would not be changing her bonus.

221.    During a follow-up discussion President Doe #3 told her that, as a woman with a husband, she should be "grateful" for the bonus she had been given, because her husband worked, in addition to her working. Plaintiff told them that Defendant Scotia's policy dictated that she should be paid based upon her production and not on her husband's salary, but Defendant Scotia refused to rectify the discriminatory pay disparity she experienced.

222.    Plaintiff was outraged to find that Co-worker Doe #10 was paid more than her, in what amounted to a 5% increase from his previous bonus, while Plaintiff herself was paid down 40% from her previous bonus. Despite Plaintiff's shouldering of additional administrative tasks beyond her role, her revamping of the Morning Line Research Product, her liaising with the Research Team, her excellent reviews from clients that placed her far above all of her peers, and

her excellent production numbers, Plaintiff was paid down in comparison to her peers simply because she was a woman and because she had complained about gender discrimination and gender-based pay disparity in the past. Further, Plaintiff was not adequately compensated for all of her work done planning for the Annual Energy conference, which was Defendant Scotia's most crucial asset for generating business. In contrast, Co-worker Doe #10 had done no work planning for Annual Energy Conference, though in comparison their bonuses clearly did not reflect this.

223.    Upon information and belief, had Plaintiff been a man with the exact same overall performance and production numbers, she would have been paid far more in her bonus.

**Defendant Scotia Forces Plaintiff to Work with a Known Sexual Harasser**

224.    Also, in or about January 2018 after more employees were laid off, Plaintiff had a meeting with NYC Managing Director John Doe #15 and Sales Manager Doe #8 about a new client that was being assigned to her. At this point the sales force had shrunk from 14 to 7 salespeople and she was excited to hear that she would finally be assigned a new client.  Her excitement turned to disappointment, fear, and disgust however, when she learned that she was being assigned to a certain New York City account "because the client loves women."

225.    When Defendant Scotia forced Plaintiff to take on this certain New York City account because they believed that the client ("Known Harasser Doe") wanted to work a woman whom he could sexually harass, they KNEW that they were placing Plaintiff in a position to be the victim of sexual harassment in New York City-in fact, the reason for the assignment was specifically SO Known Harasser Doe could sexually harass Plaintiff in New York City.

226.    Upon information and belief, NYC Managing Director John Doe #15 and Sales Manager Doe #8 intended to humiliate Plaintiff by specifically making a point of informing her that the only reason she was getting the account is because they wanted to ensure Defendant Scotia

could make money by giving the account to a woman who Known Harasser Doe could sexually harass.

227.    Plaintiff told them that she did not feel comfortable taking the account because the client had a history of sexually harassing women in the workplace-which the men assigning her the client already knew.

228.    Sales Manager Doe #8 told her that it would "be fine," that it was "no big deal," that Known Harasser Doe was a "great guy," and that she would "love him."

229.    When Plaintiff continued to object to being assigned to an account because she was a woman and the client "liked women," Sales Manager Doe #8 made it clear that she had no choice.[7]

230.    Horrified that Defendant Scotia would use her to entertain a predatory client, but obviously left with no choice, Plaintiff was forced to work with Known Harasser Doe.

### Known Harasser Doe Sexually Harasses Plaintiff in New York City

231.    Thereafter, as her job required her to do with clients, Plaintiff was forced to take Known Harasser Doe out for working meals and social gatherings on at least four occasions in New York City.

232.    On each of those occasions, Known Harasser Doe flirted with her, made suggestive remarks to her, commented inappropriately on her appearance, invaded her personal space, hugged her impermissibly and pressed his body against hers.  Plaintiff was appalled and disgusted.

233.    Plaintiff openly and regularly continued to object to her being forced to work with Known Harasser Doe, and made it clear that he was in fact sexually harassing her each time she met with him.

---

[7] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaints.

234.    In or about March 2018, as she was required to do, Plaintiff attended Defendant Scotia's annual conference. Upon her arrival, Known Harasser Doe made a beeline for her, and in front of the entire rest of her team, blatantly sexually harassed her. As NYC Managing Director John Doe #15 and Sales Manager Doe #8 watched with amusement, Known Harasser Doe gave her long hugs, invaded her personal space, made her feel extremely uncomfortable and followed her throughout the event.

235.    Plaintiff again objected to Sales Manager Doe #8 about the sexual harassment, and he shockingly replied: "You don't know what this guy has been through in his life," and "He really is a good guy." Plaintiff answered, "Whatever happened in his life doesn't excuse his behavior," but Sales Manager Doe #8 smirked and said, "He just loves women," as if anyone who "liked women" was allowed to sexually harass Plaintiff, and as if it were her job to allow him to sexually harass her.

236.    Plaintiff also complained to NYC Managing Director John Doe #15, who agreed that Known Harasser Doe's behavior was "disgusting" and "inappropriate," but did not act. He said they would talk about it at a later date.

237.    Plaintiff was not taken off the account and continued to be sexually harassed by Known Harasser Doe thereafter each time she met with him in New York City until she became so disgusted that she was forced to send analysts in her place to meet with him.  Known Harasser Doe sexually harassed Plaintiff on two occasions at New York City restaurant Avra, at Monkey Bar and at Nobu in New York City

**Plaintiff Again Reports Sales Manager Doe #8's Discriminatory Behavior in New York**

238.    In or about early 2018, after Sales Manager Doe #8 was promoted, Plaintiff repeatedly reported Sales Manager Doe #8's discriminatory conduct to President Doe #3 and to

NYC Managing Director #15, statingthat she was "not comfortable" with Sales Manager Doe #8 being her manager because he "did not respect women in general" and that he certainly did not respect her. She also stated that no one at Defendant Scotia cared, including their bosses and decision makers in New York, who watched him treat her poorly.

239.    President Doe #3 later told Plaintiff off-handedly that she should not worry, he had "talked to" Sales Manager Doe #8 about the way he "treated" them.

240.    Not surprisingly Sales Manager Doe #8's hostility to Plaintiff and women in the New Orleans office did not cease, and when she returned to President Doe #3 to complain again, he dismissed her concerns regarding the way he spoke to other women and said he had "already talked to" Sales Manager Doe #8 and there was nothing else he could do.

241.    Upon information and belief, Defendant Scotia again informed Sales Manager Doe #8 that Plaintiff had attempted to report him for gender discrimination, and he engaged in more retaliation against her.

242.    In or about late 2017, while in New York to meet with Scotia clients and Scotia team members,  and working from Scotia's New York office,  Plaintiff met with John Doe #15 to report John Doe #4 and John Doe #8's discriminatory behavior as well as the hostile work environment she and the Only Other Female Salesperson incurred at Defendant Scotiabank and to specifically complain about why a less competent white male was given the Sales Manager role over her.

243.    John Doe #15 acted annoyed and dismissive towards her and made it clear to her that she was doing something "wrong" by complaining and reporting.

**Defendant CEO Lawrence Sidelines Plaintiff In New York**

244.    As she and John Doe #15 left their meeting, they bumped into Defendant CEO

Lawrence. He was extremely friendly to John Doe #15, but when Plaintiff said hello, he looked at her as if he did not know who she was. Plaintiff was extremely embarrassed, and John Doe #15 tried to clear the awkwardness by stating, "You remember Emily, From New Orleans." Defendant CEO Lawrence nodded, shook Plaintiff's hand and walked away.

245.    Between 2017 and 2019, Defendant CEO Lawrence never met with Plaintiff while she was working in the New York office or when he was in New Orleans attending Defendant Scotia's conferences, even though Plaintiff ran the conferences and even though he made time to meet with her white male peers in New York and New Orleans to discuss business, leadership, strategy and career growth.  In fact, Plaintiff never even spoke to him on the phone, though her male peers told her that they spoke to him and met with him.

246.    Upon information and belief, Defendant CEO Lawrence believes that Energy Sales Team should be made up exclusively of white males.

**Plaintiff Does All of the Work of The Sales Manager, Without the Manager Title**

247.    Also, in or about all of 2018, Plaintiff shouldered most of the Sales Manager responsibilities, while Sales Manager Doe #8 did little or nothing as a Sales Manager. She facilitated hiring, made efforts to boost morale, organized Defendant Scotia's yearly conference, assisted with research decisions, organized research field trips, and thought of innovative ways to ensure that Defendant Scotia's reputation in the industry was still strong. Her efforts for Defendant Scotia ensured that they could attract talent to Defendant Scotia when they were hiring. These were all responsibilities of the Sales Manager, and ones that should have been done by Sales Manager Doe #8, who refused to take any responsibilities, and Plaintiff was in no way compensated for this extra work she did for the firm or given the title of Sales Manager.

248.    In many instances, during conference calls with Defendant Scotia managers, Sales

Manager Doe #8 took credit for her work, interrupted her, and spoke over her when she tried to talk. Plaintiff knew that he would never have done this to his white male colleagues. Many of Defendant Scotia managers gave Sales Manager Doe #8 the respect that came with the title of Sales Manager, while ignoring Plaintiff, the woman, who had done all of the work.

249.    In addition to her Sales and Managerial work, Plaintiff was repeatedly tasked with administrative jobs because she was a woman, including planning parties and organizing expenses, and planning the food and drink for business outings.

250.    Plaintiff reported to President Doe #3 and NYC Managing Director John Doe #15 that she was doing all of the work of the Sales Manager, and Sales Manager Doe #8 was not.

251.    In response to her reports, NYC Managing Director John Doe #15 promised Plaintiff that she had a bright future at Defendant Scotia, and that he wanted her to be a Managing Director, a much higher paying and higher ranked position than Sales Manager, but that she would have to wait for the time being.

252.    Head of Research Stewart also advocated for Plaintiff; she told Plaintiff that she had reported to NYC Managing Director John Doe #15 that Plaintiff was doing all of the work of the Sales Manager, and Sales Manager Doe #8 was not. She also reported that Plaintiff was doing incredibly valuable work organizing the Annual Energy Conference, and she deserved to be compensated for her work.

253.    Co-worker Doe #10 also advocated for Plaintiff; he told Plaintiff that he had informed NYC Managing Director John Doe #15 that Plaintiff was doing all of the work of the Sales Manager, as well as organizing Defendant Scotia's highly important Annual Energy Conference, and that she deserved to be compensated for this work.

254.    During the 2018 Annual Energy Conference, even though Plaintiff was running the

entire conference, she was routinely left out of networking opportunities with Defendant Scotia's leadership, including Defendant CEO Lawrence, even though her male counterparts regularly met with Defendant Scotia's leadership, including Defendant CEO Brian Porter throughout the conference.

255.    President Doe #3 repeatedly dismissed Plaintiff by saying to her: "You don't want to be Sales Manager" and "it's not for you," and "you have kids at home," despite the fact that the new title would come with more respect from the white male-dominated chain of command at Defendant Scotia.

256.    On two occasions, once in 2018 and once in 2019, NYC Managing Director John Doe #15 assured Plaintiff that even if she was not made Sales Manager, Defendant Scotia would promote her to Managing Director.

257.    Upon information and belief, NYC Managing Director John Doe #15 only said this to string Plaintiff along and convince her to put up with being underpaid and undervalued, while Defendant Scotia had no intention of promoting Plaintiff because she was a woman and she had reported discrimination.

**Plaintiff and Female Employees Report Gender Discrimination During a
Discrimination Workshop**

258.    In or around 2018, Defendant Scotia told the New Orleans office to participate in a non-bias workshop on discrimination in the workplace.

259.    Once the Sales team knew of the upcoming workshop, the white male salespersons joked that because their office was so un-politically correct ("Un-P.C.") they would "fail" the anti-biasworkshop.

260.    At the end of the workshop, the facilitator asked the group whether they saw any discriminatory bias in Defendant Scotia's workplace. The female employees in the room reported

that only white men were executives and managers at Defendant Scotia, all of their bosses were white men, and it was all white men in the Global Banking Markets.

261.    Upon information and belief, either the facilitator failed to report the discriminatory practices that Plaintiff and the female salespersons had reported to her, or she did so and Defendant Scotia refused to and/or failed to act to ensure that women were represented in the management in the New Orleans office, or the management of Defendant Scotia as a whole.

262.    Defendant Scotia also had computer diversity training every year, which many of the men joked about and ridiculed.  Co-worker Doe #9 put his completion certificate on his glass door, saying what a joke this training was and how funny that they would give him a pass on discriminatory behavior when he was going to continue to not be "P.C." Co-worker Doe #9 never ceased with his sexist and discriminatory comments towards women.

## The Hostile Work Environment Continues Unabated

263.    During 2018, the hostile work environment at Defendant Scotia continued unabated. The men were vocal about their disparaging views of women, and working women. White male employees continued, as they did every year, to look through binoculars at the women in bathing suits sitting by the pool across the way, and commenting on their bodies.[8] White male salespersons also made derogatory comments and jokes about minority persons with "accents" that they "could not understand."

264.    Partner Doe #4 repeatedly said that Defendant Scotia should only hire employees who were "six feet tall," "in shape," "drove a nice car" and could "talk football" (meaning, men).

265.    Racial slurs were also extremely common and Plaintiff's white male Co-workers made comments and then looked around the room to make sure that neither of the African

---

[8] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaint.

American employees had heard the hateful and discriminatory racial comments.

266.    In addition, Partner Doe #4, who was responsible for assigning meetings with clients in New York, continued to give Plaintiff the least number of and least desirable meetings in the office, which had financial implications for her sales numbers and commissions. Plaintiff repeatedly complained about this to Defendant Scotia, but nothing was done to rectify his behavior.

## Plaintiff Receives Treatment for her Emotional Distress

267.    In or about 2018, Plaintiff was experiencing significant emotional distress, anxiety, and depression due to the ongoing discrimination, retaliation, and hostile work environment she was subjected to at Defendant Scotia.

268.    Plaintiff sought regular treatment to deal with the hostile work environment, discrimination and retaliation she incurred at Defendant Scotia.

## Plaintiff Suffers Discrimination Based on Her Childcare Duties

269.    Also in or about 2018, each time Plaintiff left Defendant Scotia at an appropriate time, and after she had finished her workday, to pick up her children at school, the white male salespersons, including Partner Doe #3, Partner Doe #4, and Sales Manager Doe #8, made disparaging comments about her childcare duties, stating sarcastically "Oh, you've got to leave to pick up your kids?" or asking her with hostility where she was going, as if they were keeping tabs on her when they well knew that she had childcare duties. These comments made by men who often went golfing during the workday, left Plaintiff feeling anxious, depressed, and angered.

270.    Upon information and belief, white male salespersons and white male sales managers were never disparaged or questioned when they simply went golfing or were out for personal reasons.

## Sales Manager Doe #8 calls Plaintiff a "Fucking Bitch" In Front of the Entire Sales Team

271.    Throughout late 2017 and 2018, on three separate occasions, Sales Manager Doe #8 called Plaintiff a "bitch" and a "fucking bitch," on the trading floor in front of the sales and trading employees.[9] Plaintiff was absolutely shocked. Sales Manager Doe #8's hostile and discriminatory behavior towards Plaintiff was humiliating and disturbing, and she felt threatened by his anger.

272.    Throughout late 2017 and 2018, Plaintiff complained to President Doe #3 (until he left in March) and NYC Managing Director John Doe #15 that Sales Manager Doe #8 was "hostile" to women, spokedown to women, and did not treat them with respect. She told NYC Managing Director John Doe #15 that Sales Manager Doe #8 had called her a "bitch" and a "fucking bitch," and begged President Doe #3 and NYC Managing Director John Doe #15 to remove him from his management position so that he could not wield so much power against women in the office, such as by forcing her to work with a known sexual harasser and not assigning her lucrative accounts.

273.    President Doe #3 and NYC Managing Director John Doe #15 blew Plaintiff off by telling her that they "would talk to" Sales Manager Doe #8 about his behavior, but it never ceased, and Plaintiff told President Doe #3 and NYC Managing Director John Doe #15 that as well and that he often retaliated against her and other women MORE when they "talked to him." Plaintiff even reported the behavior again after President Doe #3 said he "talked to" Sales Manager Doe #8, but he said there was nothing else he could do  because Defendant Scotia wanted him as sales manager.

274.    Upon information and belief, President Doe #3 reported this discrimination to NYC Managing Director John NYC ManagingDirector John Doe #15 and he neither acted nor reported

---

[9] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaint and stated Sales Manager Doe #8 "called [Plaintiff] an 'effing B-*-T-C-H' three times…and [NYC Managing Director John Doe #15] failed to address him."

the discrimination to his managers or to Human Resources, and thereby abjectly failed in his responsibilities as Plaintiff's manager in elevating her claims to the appropriate managers at Defendant Scotia.

## Plaintiff Flies to New York to Interview Researchers

275.    In the Summer of 2018, Plaintiff flew to New York to interview two potential researchers, whom of course, were both white men. Plaintiff was involved in the selection process of the interviewees, but when she said she wanted to interview a female candidate, Defendant Scotia refused to consider the woman for the position. While Plaintiff was waiting in the lobby before the interview, she was appalled to see on proud display several copies of the 2018 version of the "Scotia Photography Award Book" which was signed and endorsed by Defendant Scotia President and CEO Brian J. Porter, and contained sexist and objectifying pictures of women. She felt humiliated and demoralized that anyone who entered the New York office lobby was immediately sent the message that Defendant Scotia is place that devalues and objectifies women.

## Head of Global Banking Tells Plaintiff She Cannot be a Sales Manager Because She is a Mother

276.    In or about late summer 2018, Defendant Scotia Head of Global Banking Haskins stated that they were looking for a new Sales Manager and said to Plaintiff "I know you're not in a position to be the Sales Manager because you have children at home." Shocked at this discriminatory statement from a global head of an international bank, Plaintiff was rendered speechless, especially since Sales Manager Doe #8 also had three children, and because she had long been performing the work of the role and expressing a strong desire to be in the role, all the while having three children.

277.    Defendant Scotia Head of Global Banking Haskins then stated that he was "thinking about making [Partner Doe #4] sales manager." However, he said that he had not

previously made Partner Doe #4 Sales Manager because of the way that he treated women and they were particularly concerned about the way he treated her. He stated that he was concerned that Partner Doe #4 could not be fair to her and to women. Again, Plaintiff was shocked about Defendant Scotia Head of Global Banking Haskin's concern, because she had been complaining about how very badly the current Sales Manager treated women since before he was placed in the role.

278.    Despite the infuriating bias against her as a mother, Plaintiff wanted desperately for Sales Manager Doe #8 to be removed from his position as Sales Manager, because his hostility and fury towards her was unbearable and because he treated the other female employees so badly.

279.    Aware that Defendant Scotia Head of Global Banking Haskins was extremely high in Defendant Scotia's hierarchy, she responded diplomatically by saying that he was right, Partner Doe #4 was disrespectful to her and other female employees, but she could work with him better than Sales Manager Doe #8. She also stated that since he would not consider her, perhaps he would consider Co-worker John Doe #14 ("Co-worker Doe #14"). Head of Global Banking Haskins said that Coworker Doe #14 was not up for consideration.

280.    Disappointingly, given the fact that he was well aware that he had a problem with female employees, Defendant Scotia Head of Global Banking Haskins flew Partner Doe #4 to New York to interview him for the Energy Equity Team Sales Manager position.

281.    Later, in a private conversation, Partner Doe #4 told Plaintiff that Defendant Scotia would never consider her for the role because she is a woman.

282.    Defendant Scotia Head of Global Banking Haskins, upon information and belief, flew Partner Doe #4 to New York to discuss the position despite his knowledge of Partner Doe #4's sexist, discriminatory, and hostile behavior, and never spoke to or disciplined Partner Doe

#4.  Defendant Scotia Head of Global Banking Haskins also allowed Sales Manager Doe #8 to stay in the position even though he knew that the women he "managed"  were being subjected to an extremely hostile work environment.

### Plaintiff Is Told She Will Become a "Generalist" In Order to Expand Her Business

283.    As the Energy Industry sector that she had always worked in continued to flail, Plaintiff became increasingly concerned for her job and began contemplating a job change. In or about the end of 2018, however,NYC Managing Director John Doe #15 assured and promised Plaintiff that, even though the industry was flailing, she should not leave Defendant Scotia, because Defendant Scotia was going to train her as a "generalist" Salesperson so that she could work on accounts outside of the energy industry. She was specifically told that she was going to be trained to take over Real Estate Investment Trust accounts, and Technology company accounts.

284.    NYC Managing Director John Doe #15 assured Plaintiff that Defendant Scotia planned to make her part of its broader sales team, where she could continue to earn a similar--or better—living than she had been earning as an Energy Industry Salesperson.

### NYC Managing Director John Doe #15 Refuses to Interview a Female Candidate

285.    In or about November 2018, Defendant Scotia was looking to hire a refining analyst. A client of Plaintiff from Mackenzie Financial ("The Mackenzie Client") highly recommended a female refining analyst to NYC Managing Director John Doe #15 in front of Plaintiff and told him that he should "consider hiring a woman." To Plaintiff's embarrassment and humiliation, NYC Managing Director John Doe #15 told The Mackenzie Client that "people are people," and dismissed the idea of considering a woman for the job. Upon information and belief, NYC Managing Director John Doe #15 never looked into hiring this female refining analyst.

**Scotia's Rampantly Racist and Misogynistic Hiring Continues Unabated**

286.    Towards the end of 2018, Plaintiff was disgusted to realize that, since 2012 when Scotia acquired Howard Weil, Scotia had only hired a single female (and not one African American) salesperson, trader or researcher for the Energy Equity Team for Global Banking Markets out of 36 hires, and they had blatantly refused to consider highly qualified female and African-American salespersons and traders-because they were female or African American. Defendant Scotia NEVER hired a female salesperson for the Team during Plaintiff's extremely long tenure.

287.    In 2018, Defendant Scotiabank begrudgingly hired an analyst, who upon information and belief was from India, but only after the other two people interviewed-both white men-turned down the job.  Disgustingly, throughout the interview process Sales Manager Doe #8 and Partner Doe #4 mocked the candidate's accent, constantly stated that they "couldn't even understand him" during the interview process, and repeatedly complained that Energy Equity Team's clients only wanted to work with white men.

288.    In late 2018, Plaintiff was asked to fly to New York City to interview Analyst Paul Cheng and utilities analyst Andrew Weisel. While she was there, Defendant Scotia had the offensive art books on full display in the lobby.

289.    Plaintiff was given a full tour of their new offices and met with John Doe #15 and several members of the trading team. She also met with Mark Caruso, a white man and an energy specialist that John Doe #15 hired later in 2019. No women were considered for any of these roles.

290.    In late December of 2018, the Energy Equity Team hired analyst Paul Cheng, whose qualifications were extremely superior to all other candidates-and desperately needed by Defendant Scotia. Again, Sales Manager Doe #8 and Partner Doe #4 mercilessly and openly

mocked his accent, because upon information and belief, English was his second language.  Upon information and belief, no women were interviewed for the role.

### Defendant Scotia's Head of Research Uses the Terms "Grin-Fuck" and "Pussy"

291.    On or about November 14, 2018, Stu Linde, the Head of United States Research for Defendant Scotia ("NYC Head of Research Linde"), travelled from New York to the New Orleans office "to meet the team" with NYC Managing Director John Doe #15. During his meeting, NYC Head of Research Linde used the terms "grin fuck" and "pussy."[10]

292.    Plaintiff was shocked that this was the first introduction that she had with a new member of management from New York, and yet he used these shocking and sexist terms immediately and out of context. Sales Manager Doe #8 witnessed NYC Head of Research Linde's behavior but, upon information and belief, as usual, did not report this sexist and discriminatory behavior to his superiors at Defendant Scotia, or speak to NYC Head of Research Linde about his behavior in order to ensure it ceased.

### Plaintiff is Asked to Organize the Office Christmas Party

293.    In or around December of 2018, NYC Managing Director John Doe #15 asked Plaintiffto organize the office Christmas party. Plaintiff was asked to pick the menu and wine. Upon information and belief, Plaintiff was only asked to organize the Christmas party because Defendant Scotia and NYC Managing Director John Doe #15 viewed this as "women's work," despite the factthat she was busy with her actual work.

294.    Upon information and belief, no white male employee was ever asked to plan a Christmas party.

---

[10] Defendant Scotia substantiated this claim in its investigation into Plaintiff's complaint and stated Linde "used the terms 'grin fucking' and 'pussy' at a meeting…on November 14, 2018."

**Plaintiff Endures More Gender Based Discrimination at the 2018 Holiday Party**

295.    In late 2018 at Defendant Scotia's Holiday Party, a newly hired white male trader repeatedly told Plaintiff that she was an "old lady" and said she was "too old" and "not cool" enough.  He talked about all of the women he was sleeping with, pulled up pictures of them on his cell phone and insisted that Plaintiff look at "how hot they were."  He then made a show of leaving the party to head to a strip club. When Plaintiff reported this behavior to John Doe #15 he warily dismissed her complaints, told her that the trader "was just young" and that he was a great guy who she would enjoy getting to know. John Doe #15 made it clear that Plaintiff needed to get on board and support the new hire.

**Plaintiff Yet Again Receives a Discriminatory Bonus**

296.    In or about December 2018, Plaintiff received the lowest bonus she had ever received at Defendant Scotia. Plaintiff was shocked, and complained to NYC Managing Director John Doe #15 that, as he well knew, she had been compensated less well, given fewer opportunities and been forced to perform far more work than her white male peers. She also complained that her white male peer, Co-worker Doe #10, had been paid more than her even though she had done more work for the firm.

297.    Upon information and belief, even if everyone's bonus had allegedly "gone down," Plaintiff's bonus was cut significantly more on a percentage basis than her white male peers' bonuses were cut.

298.    For example, Plaintiff's closest peer in terms of production numbers and overall performance was Co-worker Doe #10. That year, Co-worker Doe #10 was paid $185,000 more than Plaintiff, even though she had been there longer and was a greater overall contributor to the firm. While Plaintiff was paid down 62%, Co-worker Doe #10 was only paid down 42%. When Plaintiff

and Co-worker Doe #10 spoke and discussed their pay for that year, Co-worker Doe #10 miseld Plaintiff about the amount he was paid in his bonus, saying his bonus was lower than it was, and told her he was paid a similar amount to her. Upon information and belief, Co-worker Doe #10 was  not forthright with about his bonus Plaintiff because it was obvious to him that Plaintiff deserved to be paid as much if not more than him and he was trying to hide the blatant discrimination that allowed for his higher pay.

299.    Defendant Scotia simply refused to compensate Plaintiff in a way that reflected the fact that she was working far harder and more effectively than her white male counterparts, maintained strong and beneficial relationships with all of her clients, and had been forced to shoulder most of the duties of the Sales Manager role withoutbeing given the official title. Further, Defendant Scotia refused to compensate Plaintiff for her outstanding work and great amount of time she spent planning the Annual Energy Conference. In contrast, Co-worker Doe #10 had very little involvement on this conference.

300.    Upon information and belief, Plaintiff would have been paid more and asked to do less if she were a white male. Upon information and belief, if Plaintiff was compensated by the same standards her white male colleagues were, she would have received much more money.

### Defendant Scotia's Known Discriminators Get Handsome Packages

301.    In or about January 2019 both Partner Doe #4 and Sales Manager Doe #8 announced that they were resigning from the firm. Upon information and belief, despite their discriminatory, hostile, and harassing behavior and Defendant Scotia's awareness of their behavior, they were given a large lump sum to stay with Defendant Scotia an additional three months so as to attend the Annual Energy Conference, despite Plaintiff having received the lowest bonus she had ever received at Defendant Scotia just one month before Defendant asked them to

stay through the Howard Weil conference in March of 2019 and, upon information and belief, gave them each bonuses between $50,000-75,000 to "stay." Upon information and belief, they were paid far more than Plaintiff was paid as a bonus in 2019, and they contributed far less-in fact, they hardly showed up at work for those three months or to the conference.

302.    Plaintiff asked NYC Managing Director John Doe #15 to let Partner Doe #4 and SalesManager Doe #8 go and not keep them on because of their discriminatory and hostile behavior towards herself and other female employees but again, Defendant Scotia allowed known gender discriminators to continue to work at Defendant Scotia, and to gain financially despite their behavior. In fact, even when it was clear that Partner Doe #4 and SalesManager Doe #8 no longer intended to contribute value to the firm, NYC Managing Director John Doe #15 still protected them and tried to keep them employed.

### Defendant Scotia Transfers New Orleans Accounts to the New York Office

303.    In early 2019, Defendant Scotia transferred an increasing number of New Orleans accounts to the New York office. Accounts were taken from New Orleans traders and given to New York traders, while the same New Orleans salespeople continued covering them. Around this time, about half of Plaintiff's accounts were ultimately transferred to go through the New York trading desk.

304.    As a result, Plaintiff had much of her revenue reflected on the New York trading desk instead of the New Orleans trading desk. Also as a result, Plaintiff worked with the traders in the New York office on a daily basis and her presence in New York increased.

### Plaintiff Continues to Perform as the Sales Manager-- Still Without the Title

305.    Throughout 2018 and 2019, Plaintiff led the intensive recruitment process for hiring analysts.

306.    Plaintiff was also tasked with distributing account packages to other salespeople in

the office along with Co-worker Doe #10. When she ran her suggestions by Managing director

NYC Doe #15, he refused to allow substantive accounts be assigned to The Only Other Female

Salesperson, and instead assigned accounts intended for her to a white male who lived in another

state and was not actively engaged in Defendant Scotia's business. Upon information and belief,

he did so because Defendant Scotia prefers white male salespeople to handle the firm's accounts,

upon information and belief, pursuant to the direction and strategic vision of CEO Lawrence.

307.    Plaintiff also continued receiving the daily trading report, one of the duties of a

Sales Manager. Moreover, Plaintiff continued to organize research bus trip road shows for the firm

and its clients throughout the United States to ensure that clients had access to corporate meetings-

another Sales Manager duty.

308.    NYC Managing Director John Doe #15 asked Plaintiff to come to New York in

March of 2019 to meet with clients that were being re-assigned to her as a result of Manager Doe's

#8 pending departure.  While she was there, Plaintiff had lunch with NYC Managing Director John

Doe #15. Plaintiff also had dinner with clients and a white male trader from the New Orleans.  The

white male trader told Plaintiff that NYC Managing Director John Doe #15 had asked him to start

spending more time in New York and to consider moving to New York to work out of the New

York office.

309.    During a meeting in New York where Manager Doe #8 was introducing Plaintiff to

his clients whom she would be taking on, Plaintiff was once again subjected to a hostile work

environment when she was forced to listen to Manager Doe #8, make racist comments about the

few Defendant Scotia employees who were not white, saying that he could not believe an Indian

and a Asian employee were hired, because Energy clients "wanted to talk football, and it wasn't

all about the numbers [implying that Asian and Indian only contributed "numbers"]" and that

Energy clients needed people who could "speak English." Plaintiff was disgusted but not surprised.

310.   Even after Manager Doe #8 resigned from Defendant Scotia, and Plaintiff was solely performing the Sales Manager role, Defendant Scotia continued to refuse to give Plaintiff the title of Sales Manager.  Upon information and belief, CEO Lawrence refused to allow Plaintiff to be named Sales Manager because of her gender, even though she was responsible for management decisions and was exceptionally praised for all of the hard work she did on behalf of Defendant Scotia, particularly the Annual Energy Conference which was Defendant Scotia's single most important asset. Plaintiff's efforts working on the 2019 Annual Energy Conference were crucial to improve the firm's reputation, which would in turn lead to Defendant Scotia having better chances finding and hiring analysts. Plaintiff was praised by Head of US global equity sales and trading, NYC Managing Director John Doe #15, NYC Head of Research, and other Defendant Scotia leaders. Plaintiff was also praised by the conference coordinator of the Annual Energy Conference, Jane Doe #2, who told Plaintiff she "singlehandedly saved the conference."

**Defendant Scotia Praises Plaintiff's Work**

311.   On or about March 27, 2019, NYC Head of Research Linde wrote an email to Plaintiff stating:

> "Emily, I wanted to personally thank you for all you do and especially for making sure everyone was on their game for the conference. While I know there is a lot of passion around the conference it is clear that you go above and beyond. Your passion for the franchise is unwavering. I truly enjoy the partnership and am very excited about the future."

312.   That same day, March 27, 2019, NYC Managing Director John Doe #15 stated in response to the an email about the conference, in reference to the "steering group" that planned for and organized the Annual Energy Conference:

> "I totally recognize Emily's efforts over the entire year. Since we created that steering group, she has been its leader. A role she took in naturally. I made a

special effort to congratulate her and recognizer her before I left."

### Plaintiff is Told to Look for New Office Space

313.    In or about May of 2019, NYC Managing Director John Doe #15 requested that Plaintiff look for a new office space for the New Orleans office, forcing her, yet again, to take on an administrative task without compensation because she was a woman. Plaintiff worked with Defendant Scotia's office manager and local realtors to find a new office. NYC Managing Director John Doe #15 and Defendant Scotia's head of real estate leasing told her that the New Orleans office would continue to be open for at least the next five years, and thus Defendant Scotia would sign a five to ten-year lease. He also reiterated to Plaintiff that she was going to be trained as a generalist.

314.    Plaintiff was excited about the move to new offices and believed it would boost the morale of the New Orleans office as it showed Defendant Scotia's commitment to staying in New Orleans. Given the praise she received from her superiors, her successful production, and her increased responsibilities, she had no reason to believe that her position at Defendant Scotia was insecure.

### The Hostile Work Environment Continues Unabated, Despite Plaintiff's Complaints

315.    Sometime during 2019, NYC Managing Director John Doe #15 came to New Orleans with a white male trader who also worked out of New York. Together with the New Orleans salespeople, they all went out for drinks at a restaurant called Johnny Sanchez. Plaintiff sat with the white male trader again at the bar where he talked about all of the women he was sleeping with, pulled up pictures of them on his cell phone, and talked about their bodies. Plaintiff told Manager Doe #10 this and that she thought it was really inappropriate.

316.    As this was the same trader who had done the same thing at the 2018 holiday party,

Plaintiff was disillusioned and distraught to realize nothing had changed, and her complaints about the hostile, misogynist work environment would never be taken seriously by Defendant Scotia.

**Defendant Scotia Endorses and Displays a Sexist and Objectifying Book**
**Signed by the CEO of Defendant Scotia**

317.    In or about June 2019, Plaintiff was shocked that the newest version of the "Scotia Photography Award Book," which was placed in every Defendant Scotia office including hers and was signed and endorsed by Defendant Scotia President and CEO Brian J. Porter, contained even more sexist and objectifying pictures of women than the 2018 version.  Boxes and boxes of the book had been sent to each of Defendant Scotia's offices, including New York and New Orleans, and there were seemingly hundreds of copies of the offensive book stacked throughout the New Orleans and New York offices. Upon information and belief, the offensive books were supposed to be given to clients as gifts, as if to celebrate Scotia's misogynistic culture.

318.    Upon information and belief, the book discussed libido, masturbation, pornography, fetishes, and fantasies and the photos featured explicit sexual positions, and naked women grabbing their body parts.

319.    On page 187, there is a text which reads as follows:

*M.'s dog Shadow is fucking another small animal. When he stops, his large, erect penis is detached from his body. Soon I realize that a huge chunk of his lower torso is also detached. I associate this dream with a conversation I had the night before, when I introduced two former students: 'Anus, meet Anus.' One had made a video called Colon Karaoke; the other had based a performance on George Bataille's "Solar Anus."*

320.    A section of the book entitled "Libido", appearing on p. 191, states:

*Watch Un Chant D'amour: extremely erotic, it vividly captures Genet's fetishes and fantasies. But, as with most porn, the guys beating off means less than nothing to me (except I'm fascinated with the size of some of their members-- which are like extra limbs between their legs). As per LB, sex has become sublimated.*

*The death of my libido is like a death between us. The loss goes nearly unspoken, except one day I asked why he could no longer come inside me.*

321.    Another section of the book, entitled "Susan", appearing at page 193, states:

*Dream about sex, then viscerally imagine Father fucking Mother over and over, their sex life yoked to the church and a brood of wet, howling babes.*

322.    Plaintiff was highly uncomfortable as a woman that this overtly sexual book and images were displayed so prominently at Defendant Scotia but she was not surprised as the 2018 "Scotia Photography Award Book," showed naked women, women putting on make-up, trying on hairstyles, and sweeping the floor,images of women in sexual bondage, and at least twenty naked women lying on top of each other.

323.    The female employees at Defendant Scotia spoke to Plaintiff and amongst themselves about how uncomfortable and humiliated they felt by the misogynistic images being featured, celebrated, and supported in their place of employment.

324.    On one occasion, a white male back office employee commented to Plaintiff that he thought the Scotia Photography book was "pornographic and disgusting."

**Manager John Doe #15 Promotes Plaintiff's White Male Colleague Over Her**

325.    Shockingly, in or about Summer 2019, while Plaintiff was meeting with Paul Cheng, John John Doe #15, Stu Linde and Mark Caruso, who had recently been hired, in New York City, Plaintiff learned that, unbeknownst to her, NYC Managing Director John Doe #15 had promoted her white male peer, Co-worker Doe #10 (hereinafter "Sales Manager Doe #10"), to the Sales Manager position instead of her weeks before informing Plaintiff. Plaintiff was shocked, given she had been performing all of the duties of Sales Manager for months, she had more skills and more responsibilities than Sales Manager Doe #10 and she had been at Defendant Scotia for far longer.

326.   Moreover, Plaintiff had taken and passed the "Series 24" exam, a basic requirement for someone to be a manager at the firm, which Co-worker Doe #10 had not. Upon being informed that he was offered the job, Co-worker Doe #10 was told to take the Series 24 exam.

327.   Plaintiff was further shocked that she was passed over for the position after her leadership and initiative were responsible for the success of the Annual Energy Conference, Defendant Scotia's greatest asset in generating business. Plaintiff's efforts on the Annual Energy Conference were directly responsible for the improvement of the firm's reputation, and their ability to start finding and hiring more analysts.

328.   Upon information and belief, Co-worker Doe #10 was not even formally interviewed for the job, and was simply handpicked for the role because he was a white male, while Plaintiff, clearly more qualified for the role, was ignored because she was a woman and she had repeatedly reported discrimination.

329.   Other employees were shocked that Co-worker Doe #10 was being promoted to sales manager, given that Plaintiff was clearly the one performing all of the duties of a sales manager.

330.   Upon information and belief, had Plaintiff been a man, she would have been given the role of Sales Manager.

331.   Plaintiff called NYC Managing Director John Doe #15 about the fact that she was passed over for the promotion, but NYC Managing Director John Doe #15 did not call her back.

**The New Head of Sales Fosters the Hostile Work Environment**

332.   In or about September 2019, NYC Managing Director John Doe #15 announced that he was hiring a salesperson named Andrew Fecowyz, whom he said he nicknamed "Fec" as the "Head of Sales" ("Head of Sales Fec") and that he would work out of New York. Upon

information and belief, NYC Managing Director John Doe #15 did not interview a single woman or person of color for the job.

333.    In his new role, Head of Sales Fec was now in charge of assigning accounts. The day he was hired, Plaintiff was in NYC and met with Head of Sales Fec and he was instantly extremely rude and aggressive towards her. That same day Plaintiff called Sales Manager Doe #10 and said she did not like the way Head of Sales Fec spoke to her. Plaintiff told Sales Manager Doe #10 that it was clear Head of Sales Fec did not like women. Sales manager Doe told her to keep her head down and not complain to John Doe #15.

334.    Head of Sales Fec also immediately started attending meetings with Plaintiff's accounts and called Plaintiff's accounts without her knowledge.

335.    Additionally, while Plaintiff was in New York for this trip, she met with Ryan Loader, the trader who was covering a large amount of her accounts in New York.  He talked about the transfer from New York and how Defendant Scotia had made it a seamless transition for him to move from Toronto to New York and was happily promoting his career. He also said they were excited for him to move him to New York because he was the trader for Citadel, the same account that Plaintiff covered on the sales side, Defendant Scotia's largest US account.

336.    Head of Sales Fec both fostered and added to the hostile work environment at Defendant Scotia. Head of Sales Fec, like most of the other white male leaders at Defendant Scotia, expressed an aggressive, belittling, and sexist attitude towards Plaintiff and the other women in the office and made Plaintiff nervous and anxious. He did not care what the women in the office had to say, did not listen to them, put them down, interrupted them, and spoke to them with open disdain and disrespect.

337.    Head of Sales Fec openly bragged that he would be hiring men he had worked with

at Citibank who were not allowed to work during noncompete periods.  He made it clear that he wanted to hire his "Boys on the Beach" to replace Salespeople currently working in the office, thereby threatening Plaintiff's job. Soon, Head of Sales Fec hired his "buddy" Ed Donnelly, a white man, from Citibank for the Sales team ("Co-worker Donnelly") and told Plaintiff that he would be given the "West Coast" accounts, which were lucrative accounts.

338.    Defendant Scotia hired Co-worker Donnelly from Chicago and relocated him to New York for a Generalist Salesperson role. When Co-worker Donnelly was hired he began to be trained in the Energy sector immediately[11] because he did not have experience in that field.

339.    Defendant Scotia distributed a new organizational chart, on which Co-worker Donnelly, despite lesser experience, was listed higher than Plaintiff.

340.    Plaintiff called NYC Managing Director John Doe #15 three times, in or about September and October 2019, to report Head of Sales Fec's gender discriminatory behavior but he did not return her phone calls. Upon information and belief, NYC Managing Director John Doe #15 was actively avoiding Plaintiff in order to avoid having to deal with any further reports of discrimination from her.

341.    Due to Defendant Scotia's inaction every time Plaintiff spoke up, the hostile work environment continued unabated until the end of her employment in 2020. By taking no corrective action despite Plaintiff's numerous complaints, Defendant Scotia clearly endorsed the hostile, misogynist work environment.

### Plaintiff is at the Top of Almost All Other Salesperson in Production

342.    In or about the Fall of 2019, Defendant Scotia began distributing the "Sales Force outgoing production logs" of all salespersons in New Orleans, New York, and Canada each month.

---

[11] Donnelly took over many of Plaintiff's accounts when she was terminated.

Upon information and belief, Plaintiff was in the #1, #2, #3 or #4 spot for three consecutivemonths out of thirty salespersons, putting her at the top of all other sales in Defendant Scotia's sales force in terms of work effort.

343.    Upon information and belief, Head of Sales Fec was near the bottom of the sales production list, as were Co-Worker Caruso and Co-Worker Donnelly.

**Defendant Scotia Plans to Terminate Plaintiff Because of Her Gender and Because She Reported Discrimination, While Keeping her White Male Colleague**

344.    Upon information and belief and unbeknownst to Plaintiff, in or around November 2019, Defendant Scotia resolved to terminate Plaintiff in January 2020 as part of a reduction in force because Plaintiff is a woman and because she had repeatedly complained to her superiors about gender discrimination, including her gender-based pay disparity, all despite Plaintiff outperforming all of her peers, her highest overall sales commissions earned for the firm, her strong client relationships, her demonstrated ability as a leader at the firm, her invaluable work spearheading the Annual Energy Conference, and her almost 16 years of dedication to the company.

345.    Upon information and belief and unbeknownst to Plaintiff, in or around November 2019, Defendant Scotia planned to keep Sales Manager Doe #10 despite the reduction in force. Upon information and belief, had Plaintiff been a man, she would have been kept on despite the reduction in force due to her superior overall performance. However, because Plaintiff is a woman and because she reported discrimination at Defendant Scotia she was sidelined in favor of her lower-performing colleague, Sales Manager Doe #10, because Sales Manager Doe #10 was a man who did not complain of discrimination.

346.    Sales Manager Doe #10 came to the firm in 2016. Plaintiff had been for over 12 years when Sales Manager Doe was hired, and she had generated more than $40,000,000 in

business during her time at Defendant Scotia.

347.   Plaintiff generated significant business after Sales Manager Doe #10 had been hired even though she performed the functions of the Sales Manager role prior to his promotion to the role and continued to perform the duties even though he had been given the title.  Plaintiff functionally acted as Sales Manager even though she did not have the title or prestige of the role. Defendant Scotia was choosing to retain a white man over her despite her being the employee actually performed the sales manager functions.

348.   Moreover, Plaintiff had far more educational and training qualifications than Sales Manager Doe #10. Plaintiff had a JD/MBA from Tulane University, while Sales Manager Doe #10 only had an undergraduate degree. At the time, Plaintiff had the Series 24 license, a license required to be a Sales Manager, in addition to the Series 86 and 87 research analyst licenses, while Sales Manager Doe had neither. Plaintiff was clearly more valuable to the firm given her superior educational and training qualifications.

349.   Due to her superior educational and training qualifications, Plaintiff had superior relationships with both clients and analysts when compared to Sales Manager Doe #10. Indeed, Plaintiff travelled more than any other salesperson, frequently meeting with clients in New York, Chicago, Texas, and Toronto, which enabled her to have strong and beneficial client relationships. Out of all the salespeople, Plaintiff also set up the most meetings with analysts and thus had the best analyst relationships. Plaintiff was in an excellent position to support the firm well into the future.

350.   Upon information and belief, despite this reduction in force entailing the closure or partial closure of the New Orleans Office, Sales Manager Doe #10 was to be kept on working remotely.

351.  Upon information and belief, Defendant Scotia also planned to close the Boston office, but they would still be retaining the salesperson who worked from the office including, Chris Smith("Co-worker Smith"), who was to work remotely after the office closure.

352.  In or around the end of 2019, despite Plaintiff being singlehandedly responsible for the success of the last Annual Energy Conference, Defendant Scotia gave Corporate Liaison John Doe #13 the primary responsibility for the conference going forward. Upon information andbelief, Defendant Scotia removed this responsibility she had clearly excelled at because they planned on terminating Plaintiff solely because she was a woman and because of her repeated complaints of discrimination.

**Sales Manager Doe #10 Advises Plaintiff to Stop Complaining About Discrimination**

353.  Throughout Fall 2019, Plaintiff regularly complained to Sales Manager Doe #10 about the hostile work environment perpetrated by Head of Sales Fec, and how he continually mistreated her and other women at Defendant Scotia. Plaintiff told Sales Manager Doe #10 that she had tried reporting Head of Sales Fec's behavior to NYC Managing Director John Doe #15, but he would not return her calls. Plaintiff also complained to Sales Manager Doe #10 about the known Sexual Harasser Client, and how uncomfortable his behavior made her.

354.  In response, Sales Manager Doe #10 bizarrely advised Plaintiff to stop calling NYC Managing Director John Doe #15 and to stop complaining. Upon information and belief, Sales Manager Doe #10 received a directive from Defendant Scotia to not take seriously Plaintiff's complaints of discrimination and harassment, and to discourage her from complaining further, as she was being set up for termination.

355.  Upon information and belief, Sales Manager Doe #10, simply because he was a white man, was let into the "Old Boys Club" at Defendant Scotia, and was assured his employment

with Defendant Scotia would be protected in the future, so long as he silenced Plaintiff and her concerns of discrimination.

### The Sexually Harassing Client Makes Inappropriate Advances Towards Plaintiff

356.    Meanwhile even though Head of Sales Fec was threatening to take away lucrative accounts from her by actively covering them himself, he made sure that Plaintiff continued to have to cover the Known Sexual Harasser, as did NYC Managing Director John Doe #15, even though NYC Managing Director John Doe #15 had previously watched him sexually harass her.

357.    On or about November 14, 2019, the Known Sexual Harasser client sent her a Bloomberg instant message text stating, "Hey Hot Emily." Plaintiff did not respond.

358.    Plaintiff immediately tried to reach NYC Managing Director John Doe #15 to report the client's inappropriate behavior, but he would not call her back. Plaintiff stood on the sales floor and told Sales Manager Doe #10 and the entire team how disturbed she was that Defendant was knowingly placing her in harms way by intentionally subjecting her to a clients' sexual harassment. After NYC Managing Director John Doe #15 did not return her phone call, Plaintiff discussed with Sales Manager Doe #10 that she would wait to have this conversation in person with NYC Managing Director John Doe #15 since he was not responding to any of her calls. Plaintiff was forced by her manager's silence and inaction to continue a business relationship with a client who repeatedly sexually harassed her, while Defendant Scotia was fully aware of and condoned this behavior.

### Plaintiff Receives Essentially No Bonus

359.    On or about December 10, 2019, NYC Managing Director John Doe #15 told Plaintiff that she was receiving the lowest bonus she had received during all of her years at Defendant Scotia: $25,000 for the year, a 94% decrease in her bonus from the year before. Plaintiff

produced at least $3.87 million in business for Defendant Scotia on the New York and New Orleans tradingdesks, which should have translated into a bonus of approximately $983,460.

360.    While Plaintiff made $3.9 million for Defendant Scotia in production, Sales Manager Doe #10 made less than $3 million for Defendant Scotia in production. Upon information and belief, Sales Manager Doe #10 was paid over $230,000 more than Plaintiff in his bonus, despite Plaintiff's significant revenue and sales outperformance and her exceptional contributions to the firm. While Plaintiff was paid down 94% from the last year, Sales Manager Doe #10 was only paid down 56%.

361.    When Plaintiff and Sales Manager Doe #10 discussed their bonuses for this year, Sales Manager Doe #10 again misled Plaintiff about the amount he was paid in his bonus, saying he was paid "slightly more" than her. Upon information and belief, Co-worker Doe #10 was not forthright with Plaintiff about his bonus Plaintiff because it was obvious to him that Plaintiff deserved to be paid as much if not more than him and he was trying to hide the blatant discrimination that allowed for his higher pay.

362.    Upon information and belief, Plaintiff and Sales Manager Doe #10 were the only salespeople who received "2" ratings for that year, which reflected a high level of performance. In contrast, Co-Worker Doe #14 received a lower "1" rating. Upon information and belief, Plaintiff was paid the exact same as Co-worker Doe #14 in her bonus even though she received a higher rating. Further, Plaintiff was paid markedly less than Sales Manager Doe #10 even though they received the same rating because, upon information and belief, Defendant Scotia did not value Plaintiff as a female employee who repeatedly reported discrimination.

363.    Upon information and belief, Defendant Scotia paid out such a large bonus to Sales Manager Doe #10 because they planned on keeping him during the reduction in force because he

was the highest performing *white male* salesperson. Upon information and belief, despite Plaintiff being the highest performing salesperson overall, with almost 16 years of dedication to the company and with the most important contributions to the firm, especially her contributions to the Annual Energy Conference, she was not even considered to be kept on during the reduction in force because she was a woman and because she complained of discrimination and harassment.

### Plaintiff Objects to the Discriminatory Pay Again

364.    Plaintiff received her 2019 bonus on December 10, 2019. while she was working in New York City. Plaintiff vehemently objected to the discriminatory bonus to NYC Managing Director John Doe #15, stating Sales Manager Doe #10 was paid more than her simply because he wasa man. She also stated *again* that she had been paid differently than the men at Defendant Scotia for many years.

365.    NYC Managing Director John Doe #15 dismissively announced that the numbers "did not come from him" but from "the Top," meaning Defendant Scotia's leadership, including Defendant CEO Lawrence.

### Plaintiff Launches a Formal Complaint of Gender Discrimination and Hostile Work Environment

366.    On or about December 31, 2019, after receiving no response to her complaint for three weeks, Plaintiff finally filed a direct and formal complaint against Defendant Scotia by emailing a letter to Defendant CEO Lawrence Head of Global Banking Haskins, and NYC Managing Director John Doe #15, giving them, as she stated "a final opportunity to take appropriate corrective action before seeking an outside legal remedy through the EEOC or the courts."

367.    Plaintiff noted that she worked in a gender-discriminatory hostile work environment with colleagues who had treated her "with varying degrees of disdain and hostility." She further stated she had raised issues regarding "disturbing behavior, patterns and treatment [she

had] received or witnessed and blatant disregard for policies and procedures as to harassment and compensation before, no one [has] taken proper corrective action."

368.    Plaintiff reported that she was labeled a "whiner, complainer and a bitcher" told to "back it down" and noted that her job had been repeatedly threatened when she voiced complaints. Plaintiff also reported on the sexist, discriminatory, objectifying, and offensive ScotiaPhoto Book, stating that the book was "incredibly graphic with references to libido, beating off, porn, members, fetishes, and fantasies," and "numerous pictures of vaginas and breasts."

369.    Plaintiff detailed that Head of Global Banking Haskins told her she was not in a position to take the Sales Manager role because she "had young children at home," and that he discussed promoting Partner Doe #4 *after* originally telling Plaintiff that he was concerned about being able to put him in the role because of the inappropriate way that he treated her and other women. She also stated that Head of Global Banking Haskins did not address Partner Doe #4's treatment of women. Plaintiff reported that she had told NYC Managing Director John Doe #15 that Sales Manager Doe #8 called her names on the sales floor, and that he was not removed from his position. She also reported that she was told in compensation discussions, "You are a woman and have a husband to support you."

370.    Plaintiff reported that NYC Head of Research Linde came to the New Orleans office and stated "grin fuck" and "pussy," and that NYC Head of Sales Fec stated he was going to hire his "boys on the beach" to replace her, creating an environment of fear and anxiety "especially among the women."

371.    Plaintiff iterated that she was uniformly praised for her work, but this went unrewarded, as her bonuses were not reflective of her production numbers, stating: "I guess I should not have been surprised when the firm that hires and promotes harassing men and makes

women work in offices stocked with official firm books about women as sex objects failed to compensate me as promised for the extra efforts it requested." Plaintiff further asked for transparency on how bonuses were calculated given the pay disparity between herself and the white male salespersons, and across Defendant Scotia.

372.    Plaintiff noted that she had been assured by Head of Global Banking Haskins and NYC Managing Director John Doe #15 that her job was secure and so she did not look for a job or seek other employment. She also said that Head of Global Banking Haskins assured her that the New Orleans office would remain open-or that, in any case, she would work remotely. She stated that NYC Managing Director John Doe #15 and NYC Managing Director Morris told her she should be made Managing Director but given that her bonuses were cut while white male salespersons received more led her to believe that the promises were made to keep her working at the firm when she should have been seeking work elsewhere.

373.    She then stated that she would give Defendant Scotia until the end of January to review the letter "and make the correct adjustments to [her] compensation," or she would "file an EEOC charge and take any additional legal action necessary to protect [her] rights."

**Plaintiff Reports Discrimination and Harassment to Human Resources**

374.    On or about January 9, 2020, Plaintiff received a call from Anna Maria Yaroshuk, Senior Manager of Employee Relations [Human Resources] for Defendant Scotia ("HR Senior Manager Yaroshuk"). She told Plaintiff that she was conducting an investigation concerning the allegations she made in her letter and told Plaintiff to put her allegations in writing again for Human Resources and that they would meet during the week of January 20, 2020, after HR reviewed her new allegations in writing.

375.    Plaintiff drafted a letter to Defendant Scotia in which she detailed some of the

sexist, discriminatory, and hostile work environment she had experienced at the hands of Partner Doe #4, Director of Research Isaacson, Sales Manager Doe #8, Co-worker Doe #9 and NYC Head of Research Linde. Plaintiff reported that her managers and the executive staff at Defendant Scotia-including Partner Doe #3, Manager Doe #8, NYC Managing Director John Doe #15, and NYC Managing Director Morris were aware of this sexist, discriminatory and hostile environment because they were present or because she repeatedly reported this activity - but they refused to respond, and the behavior went unchanged.

376.    Plaintiff reported that she was forced by NYC Managing Director John Doe #15 and Manager Doe #8 to work with the Known Sexual Harasser client *because* he wanted to harass her, even though she reported being extremely uncomfortable doing so, and who then harassed her; and that she explicitly told NYC Managing Director Morris and NYC Managing Director John Doe #15 repeatedly that Manager Doe #8 should not be a manager because of his sexist, discriminatory, and hostile behavior towards women, and NYC Managing Director Morris promoted him. She also reported that Manager Doe #8 called her a "fucking bitch" on the sales floor.

377.    Plaintiff reported that Partner Doe #4 withheld and allocated fewer analyst meetings to her than white male salespersons, which she reported to President Doe #3 and NYC Managing Director Morris multiple times, but nothing was done, and Partner Doe #4 told her: "They will never make you sales manager, they have to talk to you like they might because you are a woman."

378.    Plaintiff also reported that white male salespersons and managers made discriminatory comments when she had childcare duties, that she was subject to pregnancy discrimination when she had her premature triplets, and that Partner Doe #4 told the Only Other

Female Salesperson: "you're not coming back to work after you have your baby, are you?  You should be at home with your kids."

379.    She stated that Head of Global Banking Haskins told her that she was not in a position to take a sales manager role "because [she] had young children at home," and that Defendant Scotia had endorsed sexist and sexually explicit Photo Books at Defendant Scotia. Plaintiff reported that Co-worker Doe #9 stated that the Only Other Female Salesperson was a "token interviewer,"and he was "not even interested in the women," he was "just required to interview a woman."

380.    Plaintiff reported on the gender pay disparity she experienced throughout her entire tenure at Defendant Scotia, and noted that, when compared to her white male co-workers, her efforts were not rewarded at compensation time. She specifically talked about her 2019 bonus and how she had been bonused just $25,000 even though she produced over $2,700,000 on the New Orleans desk and over $1,000,000 on the New York desk.

381.    Plaintiff wrote that she reported the pay disparity to NYC Managing Director Morris, who threatened that she could lose her job if she complained, and to NYC Managing Director John Doe #15 and Partner Doe #3, but nothing was ever done. She also reported that she was told that her compensation was lower because she was "a woman and ha[d] a husband to support[her]," and that "she had a dual income family" unlike the white male salespersons. Plaintiff stated that she shouldered much of the responsibility for the firm throughout 2018 including management decisions, and was extremely successful, but was not compensated or given the Sales Manager title, and yet was tasked with administrative tasks, because she was a woman. Plaintiff also reported that Head of Sales Fec told Plaintiff that he would hire his "boys on the beach." Plaintiff.

382.    Plaintiff reported that NYC Managing Director Morris and NYC Managing Director John Doe #15 told her that she would be made a Managing Director, that her performance was stellar, and that they both stated she had a long and stable future at Defendant Scotia.

383.    Plaintiff pointed out that when Defendant Scotia acquired Howard Weil, 33 out of 36 high-level team members were men, and only three were women, and Defendant Scotia had not hired a single female salesperson or trader on the Energy Equity Team since they acquired Howard Weil in 2012.

<u>**Plaintiff is Interviewed by Human Resources**</u>

384.    On or about January 15, 2020, HR Senior Manager Yaroshuk stated suddenly that Senior Legal Counsel at Defendant Scotia, Rhonda Jansen ("Legal Counsel Jansen") was flying down to New Orleans to meet with her the next day. Scotia Capital USA never had an employee relations function in the US until fall of 2019. When Anna Maria from Scotia HR conducted the investigation for Plaintiff, Anna Maria acknowledged she was new to supporting the US population. Scotia is an 80,000+ employee firm and has over 168 billion in assets and did not have an employee relations function until late 2019.

385.    Plaintiff was interviewed by Legal Counsel Jansen in person and HR Senior Manager Yaroshuk and HR Manager Rhoda [last name unknown] ("HR Manager Rhoda") on the phone on January 16, 2020. Plaintiff handed Legal Counsel Jansen theletter with her additional allegations. Legal Counsel Jansen started out by saying that Defendant Scotia had received her December 31, 2019, letter to her managers.

386.    Legal Counsel Jansen flipped through the 2019 Scotia Photography Book in front of her and said dismissively, "I didn't see much in this," and asked her to "point out" what she found offensive, even though Plaintiff's December 31, 2019, letter to her managers stated in detail

what she found offensive about the book. Plaintiff took the book and started to show her what was offensive, but Legal Counsel Jansen waved her hand and asked her to photocopy whatever she saw as offensive and mail it to Defendant Scotia after the interview.

387.   Plaintiff began going through each of the allegations in her letter, and HR Manager Rhoda aggressively questioned Plaintiff on each of her allegations, attacking and intimidating Plaintiff and barely giving her a break, which was exhausting and overwhelming. HR Manager Rhoda stated to Plaintiff dismissively: "Well, it sounds to me like this is a New Orleans office problem," to which Plaintiff responded that this was absolutely *not* true: all of her managers were in New York or Toronto, many of the people who had used discriminatory words were in New York or Toronto, and that she had repeatedly reported the discrimination to her managers in New York and Toronto, but the managers took no action. Suddenly, HR announced that "it sounded like" she was "no longer in a toxic work environment," because Sales Manager Doe #8 and Partner Doe #4 had quit, and Plaintiff immediately stated that this was in "no way" true, because her bosses in New York were still her managers, and so she continued to be subject to retaliation for making her complaint. In addition, she stated, Head of Sales Fec "terrified" her.

388.   On or about that same day, her co-worker Jane Doe told her that she had been interviewed, and said she was "very happy" to tell Defendant Scotia about the hostile work environment and discrimination that she had experienced at Defendant Scotia. Another co-worker, Jane Doe # 2, told her that she was upset that she had not been interviewed, because she would have told them about the discrimination and hostile work environment as well.

389.   Upon information and belief, besides the Only Other Female Salesperson and Co-worker Jane Doe #1, Defendant Scotia did not interview any other women in the New Orleans office, though Plaintiff had asked them to please do so.

**Defendant Scotia Substantiates Many of Plaintiff's Allegations**

390.    On January 30, 2020, Plaintiff received a phone call from Legal Counsel Jansen and HR Senior Manager Yaroshuk. Legal Counsel Jansen stated that the "standard of review" that was "utilized in these types of cases is whether on a balance of probability the alleged behavior occurred," and based on this balance they found that some of the allegations were "substantiated" that: Head of Research Linde used the terms "grin fuck" and "pussy" at a meeting with the Sales Team; Ben Isaacson "described his sex life to other employees" and "[Managing Director] John Doe #15 failed to address it;" Partner Doe #4 "made a discriminatory comment to [Co-worker Habetz] that she should stay home with her kids;" [Co-worker] Doe #9 "called [Co-worker] Habetz a "token interviewer in 2016, and said he only interviewed a woman candidate because he had to;" "several male employees including [Manager] Doe #8 and [Partner] Doe #4 regularly used binoculars in 2018" to look out of the office windows at "various women;" "[Manager] Doe #8 called [her] an 'effing b- -t-c-h' three times in the Fall of 2017, and [Managing Director] John Doe #15 failed to address him;" Manager Doe #8 "pressured [Plaintiff] to take responsibility for the [Known Sexual Harasser client] in January 2018 despite [her] expressing reservations about the client making inappropriate advances towards women, and [NYC Managing Director] John Doe #15 was present and failed to prevent it;" and "[Partner] Doe #4 repeatedly withheld and allocated fewer analysts meetings to [her] compared to [her] male colleagues."

391.    Legal Counsel Jansen told her that they would "take corrective action with respect to the behavior of NYC Head of Research Linde, Co-worker Isaacson, and NYC Managing Director John Doe #15," but that "the other implicated parties [were] no longer employees of the bank." She stated that Defendant Scotia was "not able to substantiate" the other allegations

Plaintiff made.

392.    Upon information and belief, Defendant Scotia failed to take "corrective action" as to NYC Head of Research Linde, Co-worker Isaacson, and NYC Managing Director John Doe #15. Upon information and belief, at least two of these individuals are still today employed by Defendant Scotia and suffered no repercussions for their sexist, discriminatory, and hostile behavior.

393.    Also upon information and belief, Defendant Scotia failed to take any corrective action for any other white male salesperson, manager, or executive whom Plaintiff reported on in her letters, or in her interview.

394.    Legal Counsel Jansen further stated that the Scotia Photography Book was "created by a jury of art experts," the artists were known as "feminist artists," and that "they and others would have a different interpretation" as to whether the content was "sexist to women." She agreed that just because CEO Brian Porter had pieces in his home and "considered [them] art" did not mean that the book was acceptable in the workplace. Upon information and belief, other employees told her that they found the book revolting and disgusting.

395.    Legal Counsel Jansen stated that Plaintiff's claim that the Scotia Photography Book was offensive and inappropriate for the workplace was "unsubstantiated," but that they had "recommended that [Defendant Scotia] review its practice of making the photo books available in the workplace." Plaintiff was baffled that Legal Counsel Jansen attempted to justify the Scotia Photography Book's presence in the workplace, but contradictorily also stated that Defendant Scotia should "review" whether they belong in the workplace and thus potentially consider removing them. Upon information and belief, Legal Counsel Jansen was well aware that female employees found the book revolting, disgusting, sexist, and offensive, but told Plaintiff her claims

were "unsubstantiated" in an attempt to protect Defendant Scotia from liability.

396.    With regards to her maternity leave, Legal Counsel Jansen told her that they did not make a finding on the issue because whatever potential pregnancy discrimination she may have reported occurred "prior to the closing of the acquisition [by Defendant Scotia] of Howard Weil," which was not true. They also stated that her July travel was "past any period of maternity leave entitlement" and that her travel in May and June was a "combined choice" between her and Defendant Scotia and that she "could have come forward" and asked for the leave, ignoring that Defendant Scotia ordered Plaintiff to work during the Spring Conference, and pressured her to work. They stated that they could not corroborate that Head of Sales Fec said he would hire "his boys on the beach," nor that she was "passed over for promotions as a woman," or that "[Defendant Scotia's] hiring practices were unfairly tilted towards [sic] women."

397.    Still, Legal Counsel Jansen told Plaintiff that she made a recommendation to Defendant Scotia that in future acquisitions, employees should be immediately informed of HR policies regarding maternity leave. Plaintiff was baffled that Legal Counsel Jansen simultaneously attempt to evade any culpability, but still admitted that the policies should be changed in light of the pregnancy discrimination Plaintiff experienced and employees should be informed about their entitlement to maternity leave.

## **Plaintiff is Terminated Following the HR Investigation**

398.    On or about January 30, 2020, at 9:00 am, just thirty minutes after she received the "results" of their alleged "investigation," Plaintiff was terminated, and Defendant Scotia told her this was because her job was allegedly "redundant."

399.    At the time Plaintiff was terminated, she had already produced $1,000,000 of business for Defendant Scotia in Fiscal Year 2020, while Co-worker Doe #10, who Defendant

Scotia had initially planned on keeping, had only produced about $250,000 in business in Fiscal Year 2020. Upon information and belief, the only reason Defendant Scotia would plan to keep Co-worker Doe #10 over Plaintiff in light of Plaintiff's far superior production was due to the fact that Plaintiff was a woman who reported discrimination.

400.   The Only Other Female Salesperson was also terminated at or around that time.

401.   Upon information and belief, in light of Plaintiff's interview with HR, Defendant Scotia realized that they had no choice but to also terminate Sales Manager Doe #10 and the last remaining white male Salesperson in the New Orleans office or else they would be further discriminating against Plaintiff's and the Only Other Female Salesperson-and be liable for same. Upon information and belief, the decision to file Sales Manager Doe #10 came on or about January 25, 2020, after Plaintiff's formal complaint to Defendant Scotia. Upon information and belief, prior to Plaintiff's complaint, Defendant Scotia had fully intended to retain Sales Manager Doe #10.

402.   Upon information and belief, Defendant Scotia terminated Plaintiff despite her extremely successful career because she refused to accept Defendant Scotia's discriminatory beliefs about women in the workplace, particularly women who are pregnant or with children, in retaliation for reporting gender discrimination repeatedly, and in retaliation for making a report to Defendant Scotia of gender discrimination to both her managers, and Human Resources.

403.   Upon information and belief, had Defendant Scotia acted in a non-discriminatory manner, it would have retained Plaintiff who had been working for and was successful with Defendant Scotia for more than a decade, rather than hire or retain four white male associates who had a shorter tenure, and were less successful than Plaintiff.

404.   Upon information and belief, the white male salespersons who were retained by

Defendant Scotia, including Ed Donnelly and Mark Caruso were given additional training by Defendant Scotia, and were therefore given training that Defendant Scotia promised to, and could have delivered, to Plaintiff in order to retain her.

405.    Upon information and belief, following Plaintiff's formal complaint, Defendant Scotia promoted a Black woman to a sales position in an effort to defend against their discriminatory behavior, and allowed her to work on US accounts from Toronto.

406.    Upon information and belief, the decision to terminate Sales Manager Doe #10, was made to thwart potential claims for discrimination and retaliation against Defendant Scotia.

407.    Upon information and belief, the New Orleans office actually remains open or remained open for some time after Plaintiff was terminated, there are just no salespeople based out of New Orleans, instead, white male Salespeople from New York handle the accounts that were covered by sales in New Orleans.  For a number of months after Plaintiff's termination,  support staff remained working in office in New Orleans.

408.    Upon information and belief, had Defendant Scotia decided to close the New Orleans office for legitimate logistical reasons (and actually closed it), Plaintiff could easily have worked remotely with only a computer and a telephone from her home, or been transferred to the New York office and generated as much revenue and success for Defendant Scotia as she always had.

409.    Upon information and belief, while Defendant Scotia claimed to have also closed the Boston office, Co-worker Smith continued working remotely. Upon information and belief, after the New Orleans office "closed," the Energy Equity team's New York salesmen continued to cover accounts all over the country-including Plaintiff's accounts and accounts she easily could have easily covered remotely.

**Scotia's Attempts to Hide their Historical Discrimination**

410.    In 2020, Defendant Scotia suddenly decided to hire women.  Not surprisingly, all of the women were hired from the outside, as Scotia had such limited internal female talent to chose from, and because Scotia does not like to promote female employees.  They still have yet to make any efforts to add any other diversity within the company.

**AS AND FOR THE FIRST CAUSE OF ACTION**
*(Gender Discrimination and Sexual Harassment in Violation of Title VII against Defendant Scotia)*

411.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

412.    Defendant Scotia has discriminated against Plaintiff on the basis of her gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"). Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Scotia's wrongful conduct.

413.    Defendant Scotia has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white male and by subjecting her to severe and pervasiveharassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions,disparate terms and conditions of employment on the basis of her sex.

414.    Defendant Scotia's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

415.    By reason of Defendant Scotia's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

**AS AND FOR THE SECOND CAUSE OF ACTION**
*(Retaliation in Violation of Title VII against Defendant Scotia)*

416.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

417.    Plaintiff repeatedly objected to and reported to Defendant Scotia about Defendant Scotia's discriminatory treatment of her.

418.    In retaliation, Defendant Scotia subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff a hostile work environment, disparate treatment, and a termination of Plaintiff's employment.

419.    Defendant Scotia's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

420.    As a result of Defendant Scotia's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

421.    By reason of Defendant Scotia's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

**AS AND FOR THE THIRD CAUSE OF ACTION**
*(Gender Discrimination and Sexual Harassment in Violation of the New York CityHuman Rights Law, and the New York State Human Rights Law Against All Defendants)*

422.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

423.    Defendant has discriminated against Plaintiff on the basis of her gender in violation of the New York State Human Rights Law, New York State Executive Law § 296, *et seq.*, and the New York City Human Rights Law, the Administrative Code of the City of New York § 8-101, *et seq.* Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's

wrongful conduct.

424.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white male employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and/or other forms of discrimination on the basis of her sex.

425.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

426.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Lawand the New York City Human Rights Law Against All Defendants)*

427.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

428.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

429.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, and disparateterms and conditions of employment.

430.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

431.    As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

432.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act Against Defendant Scotia)*

433.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

434.    At all times relevant to this action, Plaintiff was employed by Defendant Scotia within the meaning of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 201 *et seq.*, as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*

435.    At all times relevant to this action, Defendant Scotia was an employer within the meaning of the FLSA and the Equal Pay Act.

436.    The acts, practices and policies of Defendant Scotia, as set forth above, constitute discrimination against Plaintiff, in violation of the FLSA and the Equal Pay Act, by unlawfully paying female employees less than white male employees for equal work. Upon information and belief,Defendant Scotia was aware of complaints made by Plaintiff concerning Defendant's unfair paypractices, but did not rectify or investigate its unlawful pay practices.

437.    Defendant Scotia's violations of the Equal Pay Act were willful and/or reckless, entitling plaintiff to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Unequal Pay in Violation of the New York Labor Law)*

438.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

439.    At all times relevant to this action, plaintiff was employed by defendants within the meaning of Article 6 of the New York Labor Law §§ 190, *et seq*.

440.    Defendant violated the right of Plaintiff to be paid the same as white male employees performing equal work, in violation of New York Labor Law § 194.

441.    The acts, practices and policies of Defendant Scotia, as set forth above, constitute discrimination against plaintiff, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, et seq.

442.    Upon information and belief, Defendant Scotia was aware of complaints by Plaintiff concerning Defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

443.    Defendant's violations of the New York Labor Law §§ 190, *et seq.*, were therefore willful within the meaning of N.Y. Labor Law § 198, entitling plaintiff to liquidated damages.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Discrimination/Harassment – Louisiana Employment Discrimination Law Against Defendant Scotia)*

444.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth.

445.    Defendant has intentionally discriminated against Plaintiff on the basis of her sex. Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white male employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions,

disparate terms and conditions of employment, and/or other forms of discrimination on the basis of her sex.

446.    Defendant created, tolerated, and condoned conduct that was severe or pervasive directed towards Plaintiff on account of her sex.

447.    Plaintiff requests that she be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of the Defendants complained of herein are in violations of the laws of Louisiana, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorneys fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

### AS AND FOR THE EIGHTH CAUSE OF ACTION
*(Retaliation – Louisiana Employment Discrimination Law Against Defendant Scotia)*

448.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth.

449.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

450.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, and disparateterms and conditions of employment.

451.    Plaintiff has been retaliated against in response to her participation in proceedings under the LEDL as well as to her opposition of Defendant's practices, which violate the LEDL.

452.    Defendant engaged in conduct materially adverse to a reasonable employee.

453.    Plaintiff requests that she be awarded all available relief including, but not limited

to, a declaratory judgment that the acts and practices of the Defendant's complained of herein are in violations of the laws of Louisiana, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorneys fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## DEMAND FOR JURY

454.   Plaintiff hereby demands a trial by jury for all issues in this case, except for those that are reserved to the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, having set forth her Complaint, Plaintiff respectfully requests that:

(i) she be awarded all available relief under Title VII, the LEDL, the New York State Human Rights Law, the New York City Human Rights Law, and the New York Labor Law, including, but not limited to, a declaratory judgment that the acts and practices of the Defendants complained of herein are in violations of the laws of the United States and Louisiana, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, unpaid wages, penalty wages, judicial interest, attorneys fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper;

(ii)  she be awarded all available relief under the FLSA, including a declaratory judgment that the practices complained of herein are unlawful under the FLSA and that Defendants willfully violated the rights of Plaintiff under the FLSA; and unpaid back wages and liquidated damages equal in amount to the unpaid compensation found due to her under

the FLSA;

(iii)  she be awarded attorney's fees, pre-judgment and post-judgment interest, and costs (including expert witness expenses), all as provided by law; and

(v) she be awarded any other legal and equitable relief that this Court deems just and proper.

Dated:  New York, New York
        September 7, 2021

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Plaintiff*

By: */s/ Megan S. Goddard*
      Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: 646-504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com